**Junior Lewis DAVIS, Plaintiff–Appellee,**

v.

**Mary Sue DAVIS, Defendant–Appellant.**

Supreme Court of Tennessee,
at Knoxville.

June 1, 1992.

Charles M. Clifford, Maryville, for plaintiff-appellee.

Barry Friedman, Ellen Wright Clayton, Nashville, Janet Benshoof, Rachael N. Pine, Lynn M. Paltrow, New York City, for amici curiae American Fertility Soc., et al.

Kurt Erlenbach, Titusville, Fla., for defendant-appellant.

Kevin J. Todd, Clarke D. Forsythe, Chicago, Ill., Richard J. Ryan, Jr., Memphis, for amicus curiae American Academy of Medical Ethics.

## OPINION

DAUGHTREY, Justice.

This appeal presents a question of first impression, involving the disposition of the cryogenically-preserved product of *in vitro* fertilization (IVF), commonly referred to in the popular press and the legal journals as "frozen embryos." The case began as a divorce action, filed by the appellee, Junior Lewis Davis, against his then wife, appellant Mary Sue Davis. The parties were able to agree upon all terms of dissolution, except one: who was to have "custody" of the seven "frozen embryos" stored in a Knoxville fertility clinic that had attempted to assist the Davises in achieving a much-wanted pregnancy during a happier period in their relationship.

### I. *Introduction*

Mary Sue Davis originally asked for control of the "frozen embryos" with the intent to have them transferred to her own uterus, in a post-divorce effort to become pregnant. Junior Davis objected, saying that he preferred to leave the embryos in their frozen state until he decided whether or not he wanted to become a parent outside the bounds of marriage.

Based on its determination that the embryos were "human beings" from the moment of fertilization, the trial court awarded "custody" to Mary Sue Davis and directed that she "be permitted the opportunity to bring these children to term through implantation." The Court of Appeals reversed, finding that Junior Davis has a "constitutionally protected right not to beget a child where no pregnancy has taken place" and holding that "there is no compelling state interest to justify [ ] ordering implantation against the will of either party." The Court of Appeals further held that "the parties share an interest in the seven fertilized ova" and remanded the case to the trial court for entry of an order vesting them with "joint control ... and equal voice over their disposition."

Mary Sue Davis then sought review in this Court, contesting the validity of the constitutional basis for the Court of Appeals decision. We granted review, not because we disagree with the basic legal analysis utilized by the intermediate court, but because of the obvious importance of the case in terms of the development of law regarding the new reproductive technologies, and because the decision of the Court of Appeals does not give adequate guidance to the trial court in the event the parties cannot agree.

We note, in this latter regard, that their positions have already shifted: both have remarried and Mary Sue Davis (now Mary Sue Stowe) has moved out of state. She no longer wishes to utilize the "frozen embryos" herself, but wants authority to donate them to a childless couple. Junior Davis is adamantly opposed to such donation and would prefer to see the "frozen embryos" discarded. The result is, once again, an impasse, but the parties' current legal position does have an effect on the probable outcome of the case, as discussed below.

At the outset, it is important to note the absence of two critical factors that might otherwise influence or control the result of this litigation: When the Davises signed up for the IVF program at the Knoxville clinic, they did not execute a written agreement specifying what disposition should be made of any unused embryos that might result from the cryopreservation process. Moreover, there was at that time no Tennessee statute governing such disposition, nor has one been enacted in the meantime.[1]

In addition, because of the uniqueness of the question before us, we have no case law to guide us to a decision in this case. Despite the fact that over 5,000 IVF babies have been born in this country and the fact that some 20,000 or more "frozen embryos" remain in storage, there are apparently very few other litigated cases involving the disputed disposition of untransferred "frozen embryos," and none is on point with the facts in this case.[2]

But, if we have no statutory authority or common law precedents to guide us, we do have the benefit of extensive comment and analysis in the legal journals. In those articles, medical-legal scholars and ethicists have proposed various models for the disposition of "frozen embryos" when unanticipated contingencies arise, such as divorce, death of one or both of the parties, financial reversals, or simple disenchantment with the IVF process. Those models range from a rule requiring, at one extreme, that all embryos be used by the gamete-providers or donated for uterine transfer, and, at the other extreme, that any unused embryos be automatically discarded.[3] Other formulations would vest control in the female gamete-provider—in every case, because of her greater physical and emotional contribution to the IVF process,[4] or perhaps only in the event that she wishes to use them herself.[5] There are also two "implied contract" models: one would infer from enrollment in an IVF program that the IVF clinic has authority to decide in the event of an impasse whether to donate,

---

1. At the time of trial, only one state had enacted pertinent legislation. A Louisiana statute entitled "Human Embryos," among other things, forbids the intentional destruction of a cryopreserved IVF embryo and declares that disputes between parties should be resolved in the "best interest" of the embryo. 1986 La.Acts R.S. 9:121 et seq. Under the Louisiana statute, unwanted embryos must be made available for "adoptive implantation."

2. The only reported decision is *York v. Jones*, 717 F.Supp. 421 (E.D.Va.1989), discussed at length in Section IV, below. The unreported case of *Del Zio v. Columbia Presbyterian Medical Center* is summarized in footnote 21, below. A third case, involving a California couple who underwent IVF in Australia and later died in an airplane crash, is noted in Smith, *Australia's*

*Frozen "Orphan" Embryos*, 24 J.Fam.L. 27 (1985–86). Because the couple died intestate, their estates were distributed under California law without regard to the "frozen embryos" left in storage in Australia.

3. Note, *The Legal Status of Frozen Embryos: Analysis and Proposed Guidelines for a Uniform Law*, 17 J.Legis. 97 (1990).

4. This is the so-called "sweat-equity" model. Robertson, *Resolving Disputes over Frozen Embryos*," Hastings Center Report at p. 7, Nov./Dec. 1989.

5. Andrews, *The Legal Status of the Embryo*, 32 Loyola L.Rev. 357 (1986).

discard, or use the "frozen embryos" for research; the other would infer from the parties' participation in the creation of the embryos that they had made an irrevocable commitment to reproduction and would require transfer either to the female provider or to a donee. There are also the so-called "equity models": one would avoid the conflict altogether by dividing the "frozen embryos" equally between the parties, to do with as they wish;[6] the other would award veto power to the party wishing to avoid parenthood, whether it be the female or the male progenitor.[7]

Each of these possible models has the virtue of ease of application. Adoption of any of them would establish a bright-line test that would dispose of disputes like the one we have before us in a clear and predictable manner. As appealing as that possibility might seem, we conclude that given the relevant principles of constitutional law, the existing public policy of Tennessee with regard to unborn life, the current state of scientific knowledge giving rise to the emerging reproductive technologies, and the ethical considerations that have developed in response to that scientific knowledge, there can be no easy answer to the question we now face. We conclude, instead, that we must weigh the interests of each party to the dispute, in terms of the facts and analysis set out below, in order to resolve that dispute in a fair and responsible manner.

## II. *The Facts*

Mary Sue Davis and Junior Lewis Davis met while they were both in the Army and stationed in Germany in the spring of 1979. After a period of courtship, they came home to the United States and were married on April 26, 1980. When their leave was up, they then returned to their posts in Germany as a married couple.

Within six months of returning to Germany, Mary Sue became pregnant but unfortunately suffered an extremely painful tubal pregnancy, as a result of which she had surgery to remove her right fallopian tube. This tubal pregnancy was followed by four others during the course of the marriage. After her fifth tubal pregnancy, Mary Sue chose to have her left fallopian tube ligated, thus leaving her without functional fallopian tubes by which to conceive naturally. The Davises attempted to adopt a child but, at the last minute, the child's birth-mother changed her mind about putting the child up for adoption. Other paths to adoption turned out to be prohibitively expensive. *In vitro* fertilization became essentially the only option for the Davises to pursue in their attempt to become parents.

As explained at trial, IVF involves the aspiration of ova from the follicles of a woman's ovaries, fertilization of these ova in a petri dish using the sperm provided by a man, and the transfer of the product of this procedure into the uterus of the woman from whom the ova were taken.[8] Implantation may then occur, resulting in a pregnancy and, it is hoped, the birth of a child.

Beginning in 1985, the Davises went through six attempts at IVF, at a total cost of $35,000, but the hoped-for pregnancy never occurred. Despite her fear of needles, at each IVF attempt Mary Sue underwent the month of subcutaneous injections necessary to shut down her pituitary gland and the eight days of intermuscular injections necessary to stimulate her ovaries to produce ova. She was anesthetized five times for the aspiration procedure to be performed. Forty-eight to 72 hours after

6. Assuming that the parties do not change their current positions, in this case the result would be "the worst of both worlds": some of the frozen embryos would likely be destroyed, contrary to Mary Sue Davis's devout wish that they be implanted and given the opportunity to come to term; at the same time, the others would likely be implanted and might come to term, thus forcing Junior Davis into unwanted parenthood.

7. Poole, *Allocation of Decision–Making Rights to Frozen Embryos,* 4 Amer.J. of Fam.L. 67 (1990).

8. Alternatively, the fertilized ova may also be transferred to the uterus of a "surrogate mother," who carries through with the pregnancy for the gamete-providers, or they may be donated to a genetically unrelated couple.

each aspiration, she returned for transfer back to her uterus, only to receive a negative pregnancy test result each time.

The Davises then opted to postpone another round of IVF until after the clinic with which they were working was prepared to offer them cryogenic preservation, scheduled for November 1988. Using this process, if more ova are aspirated and fertilized than needed, the conceptive product may be cryogenically preserved (frozen in nitrogen and stored at sub-zero temperatures) for later transfer if the transfer performed immediately does not result in a pregnancy. The unavailability of this procedure had not been a hinderance to previous IVF attempts by the Davises because Mary Sue had produced at most only three or four ova, despite hormonal stimulation. However, on their last attempt, on December 8, 1988, the gynecologist who performed the procedure was able to retrieve nine ova for fertilization. The resulting one-celled entities, referred to before division as zygotes, were then allowed to develop in petri dishes in the laboratory until they reached the four- to eight-cell stage.

Needless to say, the Davises were pleased at the initial success of the procedure. At the time, they had no thoughts of divorce and the abundance of ova for fertilization offered them a better chance at parenthood, because Mary Sue Davis could attempt to achieve a pregnancy without additional rounds of hormonal stimulation and aspiration. They both testified that although the process of cryogenic preservation was described to them, no one explained the ways in which it would change the nature of IVF for them.[9] There is, for example, no indication that they ever considered the implications of storage beyond the few months it would take to transfer the remaining "frozen embryos," if necessary. There was no discussion, let alone an agreement, concerning disposition in the event of a contingency such as divorce.

After fertilization was completed, a transfer was performed as usual on December 10, 1988; the rest of the four- to eight-cell entities were cryogenically preserved. Unfortunately, a pregnancy did not result from the December 1988 transfer, and before another transfer could be attempted, Junior Davis filed for divorce— in February 1989. He testified that he had known that their marriage "was not very stable" for a year or more, but had hoped that the birth of a child would improve their relationship. Mary Sue Davis testified that she had no idea that there was a problem with their marriage.[10] As noted earlier, the divorce proceedings were complicated only by the issue of the disposition of the "frozen embryos."

### III. *The Scientific Testimony*

In the record, and especially in the trial court's opinion, there is a great deal of discussion about the proper descriptive terminology to be used in this case. Although this discussion appears at first glance to be a matter simply of semantics, semantical distinctions are significant in this context, because language defines legal status and can limit legal rights.[11] Obviously, an "adult" has a different legal status than does a "child." Likewise, "child" means something other than "fetus."[12] A "fe-

9. They also were not asked to sign any consent forms. Apparently the clinic was in the process of moving its location when the Davises underwent this last round and, because timing of each step of IVF is crucial, it was impossible to postpone the procedure until the appropriate forms were located.

10. Mary Sue Davis's testimony is contradictory as to whether she would have gone ahead with IVF if she had been worried about her marriage. At one point she said if she had known they were getting divorced, she would not have gone ahead with it, but at another point she indicated that she was so committed to the idea of being a mother that she could not say that

she would not have gone ahead with cryopreservation.

11. For a thorough consideration of the implications of status, see Clifford Grobstein, *Science and the Unborn*, pages 58–62, Basic Books, Inc., New York (1988).

12. As Justice Stevens noted in *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 779 n. 8, 106 S.Ct. 2169, 2188 n. 8, 90 L.Ed.2d 779 (1986) (Stevens, J., concurring), "No member of this Court has ever suggested that a fetus of a 'person' within the meaning of the Fourteenth Amendment."

tus" differs from an "embryo." There was much dispute at trial about whether the four- to eight-cell entities in this case should properly be referred to as "embryos" or as "preembryos," with resulting differences in legal analysis.

One expert, a French geneticist named Dr. Jerome Lejeune, insisted that there was no recognized scientific distinction between the two terms. He referred to the four- to eight-cell entities at issue here as "early human beings," as "tiny persons," and as his "kin." Although he is an internationally recognized geneticist, Dr. Lejeune's background fails to reflect any degree of expertise in obstetrics or gynecology (specifically in the field of infertility) or in medical ethics. His testimony revealed a profound confusion between science and religion. For example, he was deeply moved that "Madame [Mary Sue], the mother, wants to rescue babies from this concentration can," and he concluded that Junior Davis has a moral duty to try to bring these "tiny human beings" to term.[13]

Dr. LeJeune's opinion was disputed by Dr. Irving Ray King, the gynecologist who performed the IVF procedures in this case. Dr. King is a medical doctor who had practiced as a sub-speciality in the areas of infertility and reproductive endocrinology for 12 years. He established the Fertility Center of East Tennessee in Knoxville in 1984 and had worked extensively with IVF and cryopreservation. He testified that the currently accepted term for the zygote immediately after division is "preembryo" and that this term applies up until 14 days after fertilization. He testified that this 14-day period defines the accepted period for preembryo research. At about 14 days, he testified, the group of cells begins to differentiate in a process that permits the eventual development of the different body parts which will become an individual.

Dr. King's testimony was corroborated by the other experts who testified at trial, with the exception of Dr. Lejeune. It is further supported by the American Fertility Society, an organization of 10,000 physicians and scientists who specialize in problems of human infertility. The Society's June 1990 report on Ethical Considerations of the New Reproductive Technologies[14] indicates that from the point of fertilization, the resulting one-cell zygote contains "a new hereditary constitution (genome) contributed to by both parents through the union of sperm and egg." *Id.* at 31S. Continuing, the report notes:

> The stage subsequent to the zygote is cleavage, during which the single initial cell undergoes successive equal divisions with little or no intervening growth. As a result, the product cells (blastomeres) become successively smaller, while the size of the total aggregate of cells remains the same. After three such divisions, the aggregate contains eight cells in relatively loose association ... [E]ach blastomere, if separated from the others, has the potential to develop into a complete adult.... Stated another way, at the 8–cell stage, the developmental singleness of one person has not been established.

> Beyond the 8–cell stage, individual blastomeres begin to lose their zygote-like properties. Two divisions after the 8–cell stage, the 32 blastomeres are increasingly adherent, closely packed, and no longer of equal developmental potential. The impression now conveyed is of a multicellular entity, rather than of a loose packet of identical cells.

> As the number of cells continues to increase, some are formed into a surface layer, surrounding others within. The outer layers have changed in properties toward trophoblast ..., which is destined [to become part of the placenta]. The less-altered inner cells will be the source of the later embryo. The developing entity is now referred to as a blastocyst, characterized by a continuous peripheral layer of cells and a small cellular popula-

---

13. For further rather uncomplimentary characterization of Lejeune's testimony, see Annas, *A French Homunculus in a Tennessee Court,* 19 Hastings Center Report (Nov/Dec 1989).

14. Published in the official Journal of the American Fertility Society, Volume 53, number 6, June 1990.

tion within a central cavity ... It is at about this stage that the [normally] developing entity usually completes its transit through the oviduct to enter the uterus.

Cell division continues and the blastocyst enlarges through increase of both cell number and [volume]. The populations of inner and outer cells become increasingly different, not only in position and shape but in synthetic activities as well. The change is primarily in the outer population, which is altering rapidly as the blastocyst interacts with and implants into the uterine wall ... Thus, the first cellular differentiation of the new generation relates to physiologic interaction with the mother, rather than to the establishment of the embryo itself. *It is for this reason that it is appropriate to refer to the developing entity up to this point as a preembryo, rather than an embryo.*

*Id.* at 31S–32S (emphasis added). For a similar description of the biologic difference between a preembryo and an embryo, *see* Robertson, *In the Beginning: The Legal Status of Early Embryos,* 76 Va. L.Rev. 437 (1990), in which the author summarizes the findings of Clifford Grobstein in *The Early Development of Human Embryos,* 10 J.Med. & Phil. 213 (1984).

Admittedly, this distinction is not dispositive in the case before us.[15] It deserves emphasis only because inaccuracy can lead to misanalysis such as occurred at the trial level in this case. The trial court reasoned that if there is no distinction between embryos and preembryos, as Dr. Lejeune theorized, then Dr. Lejeune must also have been correct when he asserted that "human life begins at the moment of conception." From this proposition, the trial judge concluded that the eight-cell entities at issue were not preembryos but were "children in vitro." He then invoked the doctrine of

*parens patriae* and held that it was "in the best interest of the children" to be born rather than destroyed. Finding that Mary Sue Davis was willing to provide such an opportunity, but that Junior Davis was not, the trial judge awarded her "custody" of the "children in vitro."

The Court of Appeals explicitly rejected the trial judge's reasoning, as well as the result. Indeed, the argument that "human life begins at the moment of conception" and that these four- to eight-cell entities therefore have a legal right to be born has apparently been abandoned by the appellant, despite her success with it in the trial court.[16] We have nevertheless been asked by the American Fertility Society, joined by 19 other national organizations allied in this case as amici curiae, to respond to this issue because of its far-reaching implications in other cases of this kind. We find the request meritorious.

## IV. The "Person" vs. "Property" Dichotomy

■ One of the fundamental issues the inquiry poses is whether the preembryos in this case should be considered "persons" or "property" in the contemplation of the law. The Court of Appeals held, correctly, that they cannot be considered "persons" under Tennessee law:

The policy of the state on the subject matter before us may be gleaned from the state's treatment of fetuses in the womb.... The state's Wrongful Death Statute, Tenn.Code Ann. § 20–5–106 does not allow a wrongful death for a viable fetus that is not first born alive. Without live birth, the Supreme Court has said, a fetus is not a "person" within the meaning of the statute. *See e.g., Hamby v. McDaniel,* 559 S.W.2d 774 (Tenn.1977); *Durrett v. Owens,* 212 Tenn. 614, 371 S.W.2d 433 (1963); *Shousha v. Matthews*

---

**15.** It would be relevant, however, to the question of whether embryonic research is permissible, under regulations that limit such research to "preembryonic" stages. Such research is carried out principally in order to perfect *in vitro fertilization techniques and to increase the* success rate of pregnancies achieved through IVF and, as of 1986, was regulated by statute in

some 25 states. *See* L.B. Andrews, *The Legal Status of the Embryo,* 32 Loyola L.Rev. 357, 396–397 (1986).

**16.** In her brief, the appellant now characterizes the preembryos as "potential life" rather than as "human beings."

*Drivurself Service,* 210 Tenn. 384, 358 S.W.2d 471 (1962); *Hogan v. McDaniel,* 204 Tenn. 235, 319 S.W.2d 221 (1958). Other enactments by the legislature demonstrate even more explicitly that viable fetuses in the womb are not entitled to the same protection as "persons". Tenn. Code Ann. § 39–15–201 incorporates the trimester approach to abortion outlined in *Roe v. Wade,* 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973). A woman and her doctor may decide on abortion within the first three months of pregnancy but after three months, and before viability, abortion may occur at a properly regulated facility. Moreover, after viability, abortion may be chosen to save the life of the mother. This statutory scheme indicates that as embryos develop, they are accorded more respect than mere human cells because of their burgeoning potential for life. But, even after viability, they are not given legal status equivalent to that of a person already born. This concept is echoed in Tennessee's murder and assault statutes, which provide that an attack or homicide of a viable fetus may be a crime but abortion is not. *See* Tenn.Code Ann. §§ 39–13–107 and 39–13–210.

*Junior Lewis Davis v. Mary Sue Davis,* Tennessee Court of Appeals at Knoxville, No. 190, slip op. at 5–6, 1990 WL 130807 (Sept. 13, 1990).

■ Nor do preembryos enjoy protection as "persons" under federal law. In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court explicitly refused to hold that the fetus possesses independent rights under law, based upon a thorough examination of the federal constitution,[17] relevant common law principles, and the lack of scientific consensus as to when life begins. The Supreme Court concluded that "the unborn have never been recognized in the law as persons in the whole sense." *Id.* at 162, 93 S.Ct. at 731. As a matter of constitutional law, this conclusion has never been seriously challenged.[18] Hence, even as the Supreme Court in *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), permitted the states some additional leeway in regulating the right to abortion established in *Roe v. Wade,* the *Webster* decision did no more than recognize a compelling state interest in potential life at the point when viability is possible. Thus, as Justice O'Connor noted, "[v]iability remains the 'critical point.'" *Id.* at 529, 109 S.Ct. at 3062 (O'Connor, J., concurring). That stage of fetal development is far removed, both qualitatively and quantitatively, from that of the four- to eight-cell preembryos in this case.[19]

Left undisturbed, the trial court's ruling would have afforded preembryos the legal status of "persons" and vested them with legally cognizable interests separate from those of their progenitors. Such a decision would doubtless have had the effect of outlawing IVF programs in the state of Tennessee. But in setting aside the trial court's judgment, the Court of Appeals, at least by implication, may have swung too far in the opposite direction.

The intermediate court, without explicitly holding that the preembryos in this case were "property," nevertheless awarded "joint custody" of them to Mary Sue Davis and Junior Davis, citing T.C.A. §§ 68–30–101 and 39–15–208, and *York v. Jones,* 717 F.Supp. 421 (E.D.Va.1989), for the proposition that "the parties share an interest in

17. The Fourteenth Amendment, for example, limits the equal protection and due process of law to "persons *born* or naturalized in the United States."

18. As Justice Stevens noted in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 779 n. 8, 106 S.Ct. 2169, 2188 n. 8, 90 L.Ed.2d 779 (1986) (Stevens, J., concurring), "No member of this Court has ever suggested that a fetus of a 'person' within the meaning of the Fourteenth Amendment."

19. Left undisturbed in the mother's uterus, a viable fetus has an excellent chance of being brought to term and born live. In contrast, a preembryo in a petri dish, if later transferred, has only a 13–21 percent chance of achieving actual implantation. Of these pregnancies, between 56 percent and 75 percent result in live births. Jones and Rogers, *Clinical In Vitro Fertilization,* 51–62, cited in Poole, *Allocation of Decision-Making Rights to Frozen Embryos,* 4 J.Amer.Family L. 67 (1990).

the seven fertilized ova." The intermediate court did not otherwise define this interest.

The provisions of T.C.A. §§ 68–30–101 *et seq.*, on which the intermediate appellate court relied, codify the Uniform Anatomical Gift Act. T.C.A. § 39–15–208 prohibits experimentation or research using an aborted fetus in the absence of the woman's consent. These statutes address the question of who controls disposition of human organs and tissue with no further potential for autonomous human life; they are not precisely controlling on the question before us, because the "tissue" involved here *does* have the potential for developing into independent human life, even if it is not yet legally recognizable as human life itself.

The intermediate court's reliance on *York v. Jones,* is even more troublesome. That case involved a dispute between a married couple undergoing IVF procedures at the Jones Institute for Reproductive Medicine in Virginia. When the Yorks decided to move to California, they asked the Institute to transfer the one remaining "frozen embryo" that they had produced to a fertility clinic in San Diego for later implantation. The Institute refused and the Yorks sued. The federal district court assumed without deciding that the subject matter of the dispute was "property." The *York* court held that the "cryopreservation agreement" between the Yorks and the Institute created a bailment relationship, obligating the Institute to return the subject of the bailment to the Yorks once the purpose of the bailment had terminated. 717 F.Supp. at 424–425.

In this case, by citing to *York v. Jones* but failing to define precisely the "interest" that Mary Sue Davis and Junior Davis have in the preembryos, the Court of Appeals has left the implication that it is in the nature of a property interest. For purposes of clarity in future cases, we conclude that this point must be further addressed.

To our way of thinking, the most helpful discussion on this point is found not in the minuscule number of legal opinions that have involved "frozen embryos," but in the ethical standards set by The American Fertility Society, as follows:

Three major ethical positions have been articulated in the debate over preembryo status. At one extreme is the view of the preembryo as a human subject after fertilization, which requires that it be accorded the rights of a person. This position entails an obligation to provide an opportunity for implantation to occur and tends to ban any action before transfer that might harm the preembryo or that is not immediately therapeutic, such as freezing and some preembryo research.

At the opposite extreme is the view that the preembryo has a status no different from any other human tissue. With the consent of those who have decision-making authority over the preembryo, no limits should be imposed on actions taken with preembryos.

A third view—one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than that accorded to human tissue but not the respect accorded to actual persons. The preembryo is due greater respect than other human tissue because of its potential to become a person and because of its symbolic meaning for many people. Yet, it should not be treated as a person, because it has not yet developed the features of personhood, is not yet established as developmentally individual, and may never realize its biologic potential.

Report of the Ethics Committee of The American Fertility Society, *supra,* at 34S–35S.

Although the report alludes to the role of "special respect" in the context of research on preembryos not intended for transfer, it is clear that the Ethics Committee's principal concern was with the treatment accorded the transferred embryo. Thus, the Ethics Committee concludes that "special respect is necessary to protect the welfare of potential offspring ... [and] creates obligations not to hurt or injure the offspring who might be born after transfer [by research or intervention with a preembryo]." *Id.* at 35S.

In its report, the Ethics Committee then calls upon those in charge of IVF programs to establish policies in keeping with the "special respect" due preembryos and suggests:

> Within the limits set by institutional policies, decision-making authority regarding preembryos should reside with the persons who have provided the gametes.... As a matter of law, it is reasonable to assume that the gamete providers have primary decision-making authority regarding preembryos in the absence of specific legislation on the subject. A person's liberty to procreate or to avoid procreation is directly involved in most decisions involving preembryos.

*Id.* at 36S.

■ We conclude that preembryos are not, strictly speaking, either "persons" or "property," but occupy an interim category that entitles them to special respect because of their potential for human life. It follows that any interest that Mary Sue Davis and Junior Davis have in the preembryos in this case is not a true property interest. However, they do have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law.

### V. The Enforceability of Contract

Establishing the locus of the decision-making authority in this context is crucial to deciding whether the parties could have made a valid contingency agreement prior to undergoing the IVF procedures and whether such an agreement would now be enforceable on the question of disposition. Under the trial court's analysis, obviously, an agreement of this kind would be unenforceable in the event of a later disagreement, because the trial court would have to make an ad hoc "best interest of the child" determination in every case. In its opinion, the Court of Appeals did not address the question of the enforceability of prior agreements, undoubtedly because that issue was not directly raised on appeal. Despite our reluctance to treat a question not strictly necessary to the result in the case, we conclude that discussion is warranted in order to provide the necessary guidance to all those involved with IVF procedures in Tennessee in the future—the health care professionals who administer IVF programs and the scientists who engage in infertility research, as well as prospective parents seeking to achieve pregnancy by means of IVF, their physicians, and their counselors.

■ We believe, as a starting point, that an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors. This conclusion is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition.[20]

At the same time, we recognize that life is not static, and that human emotions run particularly high when a married couple is attempting to overcome infertility problems. It follows that the parties' initial "informed consent" to IVF procedures will often not be truly informed because of the near impossibility of anticipating, emotionally and psychologically, all the turns that events may take as the IVF process unfolds. Providing that the initial agreements may later be modified *by agreement* will, we think, protect the parties against some of the risks they face in this regard. But, in the absence of such agreed modification, we conclude that their prior agreements should be considered binding.

---

20. This situation is thus distinguishable from that in which a couple makes an agreement concerning abortion in the event of a future pregnancy. Such agreements are unenforceable because of the woman's right to privacy and autonomy. *See Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (invalidating written consent of spouse as a pre-requisite to abortion).

It might be argued in this case that the parties had an implied contract to reproduce using *in vitro* fertilization, that Mary Sue Davis relied on that agreement in undergoing IVF procedures, and that the court should enforce an implied contract against Junior Davis, allowing Mary Sue to dispose of the preembryos in a manner calculated to result in reproduction. The problem with such an analysis is that there is no indication in the record that disposition in the event of contingencies other than Mary Sue Davis's pregnancy was ever considered by the parties, or that Junior Davis intended to pursue reproduction outside the confines of a continuing marital relationship with Mary Sue. We therefore decline to decide this case on the basis of implied contract or the reliance doctrine.[21]

We are therefore left with this situation: there was initially no agreement between the parties concerning disposition of the preembryos under the circumstances of this case; there has been no agreement since; and there is no formula in the Court of Appeals opinion for determining the outcome if the parties cannot reach an agreement in the future.

In granting joint custody to the parties, the Court of Appeals must have anticipated that, in the absence of agreement, the preembryos would continue to be stored, as they now are, in the Knoxville fertility clinic. One problem with maintaining the status quo is that the viability of the preembryos cannot be guaranteed indefinitely. Experts in cryopreservation who testified in this case estimated the maximum length of preembryonic viability at two years.[22] Thus, the true effect of the intermediate court's opinion is to confer on Junior Davis the inherent power to veto any transfer of the preembryos in this case and thus to insure their eventual discard or self-destruction.

As noted in Section I of this opinion, the recognition of such a veto power, as long as it applies equally to both parties, is theoretically one of the routes available to resolution of the dispute in this case. Moreover, because of the current state of law regarding the right of procreation, such a rule would probably be upheld as constitutional. Nevertheless, for the reasons set out in Section VI of this opinion, we conclude that it is not the best route to take, under all the circumstances.

## VI. *The Right of Procreational Autonomy*

Although an understanding of the legal status of preembryos is necessary in order to determine the enforceability of agreements about their disposition, asking whether or not they constitute "property" is not an altogether helpful question. As the appellee points out in his brief, "[as] two or eight cell tiny lumps of complex protein, the embryos have no [intrinsic] value to either party." Their value lies in the "potential to become, after implantation, growth and birth, *children.*" Thus, the essential dispute here is not where or how or how long to store the preembryos, but whether the parties will become parents. The Court of Appeals held in effect that they will become parents if they both agree to become parents. The Court did not say what will happen if they fail to agree. We conclude that the answer to this dilemma turns on the parties' exercise of their constitutional right to privacy.

The right to privacy is not specifically mentioned in either the federal or the Tennessee state constitution, and yet there can be little doubt about its grounding in the concept of liberty reflected in those two documents. In particular, the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... de-

21. We also point out that if the roles were reversed in this case, it is highly unlikely that Junior Davis could force transfer of the preembryos to Mary Sue over her objection. Because she has an absolute right to seek termination of any resulting pregnancy, at least within the first trimester, ordering her to undergo a uterine transfer would be a futility. Ordering

donation over objection would raise the other constitutional problems discussed in Section VI.

22. This two-year limit is apparently an estimate based on technological feasibility as of the time of trial. Our survey of law journal articles indicates other estimates of viability ranging from two to ten years.

prive any person of life, liberty, or property, without due process of law." Referring to the Fourteenth Amendment, the United States Supreme Court in *Meyer v. Nebraska* observed:

> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

■ The right of privacy inherent in the constitutional concept of liberty has been further identified "as against the [power of] government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). As to scope, "the concept of liberty protects those personal rights that are fundamental, and it is not confined to the specific terms of the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1683, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

Moreover, the protection of fundamental rights is not confined to federal constitutional law. As the Minnesota Supreme Court noted in *Thiede v. Town of Scandia Valley*, 217 Minn. 218, 14 N.W.2d 400, 405 (1944) (citations omitted):

> The entire social and political structure of America rests upon the cornerstone that all men have certain rights which are inherent and inalienable. Among these are the right to be protected in life, liberty, and the pursuit of happiness; the right to acquire, possess, and enjoy property; and the right to establish a home and family relations—all under equal and impartial laws which govern the whole community and each member thereof. The rights, privileges, and immunities of citizens exist notwithstanding there is no specific enumeration thereof in State Constitutions. 'These instruments measure the powers of rulers, but they do not measure the rights of the governed.' 'The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred.' Government would not be free if they were not so held.

Hence, it is not surprising that in the Tennessee Constitution, the concept of liberty plays a central role. Article I, Section 8 provides:

> That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

Indeed, the notion of individual liberty is so deeply embedded in the Tennessee Constitution that it, alone among American constitutions, gives the people, in the face of governmental oppression and interference with liberty, the right to resist that oppression even to the extent of overthrowing the government. The relevant provisions establishing this distinctive political autonomy appear in the first two sections of Article I of the Tennessee Constitution, its Declaration of Rights:

> *Section 1. All power inherent in the people—Government under their control.*
>
> That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have at all times, an inalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper.

*Section 2.   Doctrine of nonresistance condemned.*

That government being instituted for the common benefit, the doctrine of non-resistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind.

The right to privacy, or personal autonomy ("the right to be let alone"), while not mentioned explicitly in our state constitution, is nevertheless reflected in several sections of the Tennessee Declaration of Rights, including provisions in Section 3 guaranteeing freedom of worship ("no human authority can, in any case whatever, control or interfere with the rights of conscience"); those in Section 7 prohibiting unreasonable searches and seizures ("the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures"); those in Section 19 guaranteeing freedom of speech and press ("free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty"); and the provisions in Section 27 regulating the quartering of soldiers ("no soldier shall, in time of peace, be quartered in any house without the consent of the owner").

█   Obviously, the drafters of the Tennessee Constitution of 1796 could not have anticipated the need to construe the liberty clauses of that document in terms of the choices flowing from *in vitro* fertilization procedures.  But there can be little doubt that they foresaw the need to protect individuals from unwarranted governmental intrusion into matters such as the one now before us, involving intimate questions of personal and family concern.  Based on both the language and the development of our state constitution, we have no hesitation in drawing the conclusion that there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights.

█   Undoubtedly, that right to privacy incorporates some of the attributes of the federal constitutional right to privacy and, in any given fact situation, may also share some of its contours.  As with other state constitutional rights having counterparts in the federal bill of rights, however, there is no reason to assume that there is a complete congruency.  *Compare and contrast, e.g., State v. Jacumin,* 778 S.W.2d 430 (Tenn.1989), with *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

█   Here, the specific individual freedom in dispute is the right to procreate.  In terms of the Tennessee state constitution, we hold that the right of procreation is a vital part of an individual's right to privacy.  Federal law is to the same effect.

In construing the reach of the federal constitution, the United States Supreme Court has addressed the affirmative right to procreate in only two cases.  In *Buck v. Bell,* 274 U.S. 200, 207, 47 S.Ct. 584, 584, 71 L.Ed. 1000 (1927), the Court upheld the sterilization of a "feebleminded white woman."  However, in *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Supreme Court struck down a statute that authorized the sterilization of certain categories of criminals.  The Court described the right to procreate as "one of the basic civil rights of man [sic]," 316 U.S. at 541, 62 S.Ct. at 1113, and stated that "[m]arriage and procreation are fundamental to the very existence and survival of the race."  *Id.*

In the same vein, the United States Supreme Court has said:

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

*Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (emphasis in original).  *See also Carey v. Population Services International,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (decision whether or not to beget or bear a child fundamental to individual autonomy).

That a right to procreational autonomy is inherent in our most basic concepts of liberty is also indicated by the reproductive freedom cases, *see, e.g., Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and by cases concerning parental rights and responsibilities with respect to children. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). In fact, in *Bellotti v. Baird*, the Supreme Court noted that parental autonomy is basic to the structure of our society because the family is "the institution by which we inculcate and pass down many of our most cherished values, morals and cultural." *Bellotti*, 443 U.S. at 634, 99 S.Ct. at 3043.

The United States Supreme Court has never addressed the issue of procreation in the context of *in vitro* fertilization. Moreover, the extent to which procreational autonomy is protected by the United States Constitution is no longer entirely clear. Justice Blackmun noted, in his dissent, that the plurality opinion in *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), "turns a stone face to anyone in search of what the plurality conceives as the scope of a woman's right under the Due Process Clause to terminate a pregnancy free from the coercive and brooding influence of the State." *Id.* at 538, 109 S.Ct. at 3067. The *Webster* opinion lends even less guidance to those

seeking the bounds of constitutional protection of other aspects of procreational autonomy.[23]

For the purposes of this litigation it is sufficient to note that, whatever its ultimate constitutional boundaries, the right of procreational autonomy is composed of two rights of equal significance—the right to procreate and the right to avoid procreation. Undoubtedly, both are subject to protections and limitations. *See e.g., Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (parental control over the education or health care of their children subject to some limits); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (states' interests in potential life overcomes right to avoid procreation by abortion in later states of pregnancy).

The equivalence of and inherent tension between these two interests are nowhere more evident than in the context of *in vitro* fertilization. None of the concerns about a woman's bodily integrity that have previously precluded men from controlling abortion decisions is applicable here.[24] We are not unmindful of the fact that the trauma (including both emotional stress and physical discomfort) to which women are subjected in the IVF process is more severe than is the impact of the procedure on men. In this sense, it is fair to say that women contribute more to the IVF process than men. Their experience, however, must be viewed in light of the joys of parenthood that is desired or the relative anguish of a lifetime of unwanted parenthood. As they stand on the brink of potential parenthood, Mary Sue Davis and Junior Lewis Davis must be seen as entirely equivalent gamete-providers.

---

**23.** Justice O'Connor did note in her concurring opinion in *Webster* that the plurality's position might threaten the development of IVF programs. Despite her concern, she voted to uphold the Missouri statute at issue, because she found the possibility "too hypothetical to support the use of declaratory judgment procedures and injunctive remedies" since there was no indication that Missouri might seek to prohibit IVF programs. *Webster*, 492 U.S. at 523, 109 S.Ct. at 3054 (O'Connor, J., concurring).

**24.** *Planned Parenthood v. Danforth*, 428 U.S. 52, 71, 96 S.Ct. 2831, 2842, 49 L.Ed.2d 788 (1976) ("Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor."). *See* discussion in *Developments in the Law—Medical Technology and the Law*, 103 Harv.L.Rev. 1519, 1544–45 (1990).

It is further evident that, however far the protection of procreational autonomy extends, the existence of the right itself dictates that decisional authority rests in the gamete-providers alone, at least to the extent that their decisions have an impact upon their individual reproductive status. As discussed in Section V above, no other person or entity has an interest sufficient to permit interference with the gamete-providers' decision to continue or terminate the IVF process, because no one else bears the consequences of these decisions in the way that the gamete-providers do.[25]

Further, at least with respect to Tennessee's public policy and its constitutional right of privacy, the state's interest in potential human life is insufficient to justify an infringement on the gamete-providers' procreational autonomy. The United States Supreme Court has indicated in *Webster*, and even in *Roe*, that the state's interest in potential human life may justify statutes or regulations that have an impact upon a person's exercise of procreational autonomy. This potential for sufficiently weighty state's interests is not, however, at issue here, because Tennessee's statutes contain no statement of public policy which reveals an interest that could justify infringing on gamete-providers' decisional authority over the preembryos to which they have contributed. As discussed in the Court of Appeals opinion, set out in Section IV, above, those statutes reveal instead a policy decision to recognize that persons born alive or capable of sustaining life *ex utero* have a higher status than do fetuses *in utero*.[26]

Certainly, if the state's interests do not become sufficiently compelling in the abortion context until the end of the first trimester,[27] after very significant developmental stages have passed, then surely there is no state interest in these preembryos which could suffice to overcome the interests of the gamete-providers. The abortion statute reveals that the increase in the state's interest is marked by each successive developmental stage such that, toward the end of a pregnancy, this interest is so compelling that abortion is almost strictly forbidden. This scheme supports the conclusion that the state's interest in the potential life embodied by these four- to eight-cell preembryos (which may or may not be able to achieve implantation in a uterine wall and which, if implanted, may or may not begin to develop into fetuses, subject to possible miscarriage) is at best slight. When weighed against the interests of the individuals and the burdens inherent in parenthood, the state's interest in the potential life of these preembryos is not sufficient to justify any infringement upon the freedom of these individuals to make their own decisions as to whether to allow a process to continue that may result in such a dramatic change in their lives as becoming parents.

The unique nature of this case requires us to note that the interests of these par-

---

**25.** *See Del Zio v. Columbia Presbyterian Medical Center*, No. 74–3558 (S.D.N.Y. filed April 12, 1978), in which a woman who was an IVF patient was awarded $50,000 for emotional distress when a doctor deliberately destroyed the contents of the petri dish in which *in vitro* fertilization was being attempted with the woman's egg and her husband's sperm.

**26.** T.C.A. § 20–5–106(b) (1980) allows a civil action for wrongful death only where the decedent has either been born alive or was viable and could reasonably have been expected to be capable of living outside the uterus. Likewise, a criminal conviction for an offense against a person, including a homicide conviction, may not be had if the victim was not viable at the time of the offense. T.C.A. § 39–13–107 and 39–13–214 (1991); *see also State v. Evans*, 745 S.W.2d 880 (Tenn.Crim.App.1987) (viable fetus not "person" or "human life" within meaning of vehicular homicide statute).

Tennessee's abortion statute reveals a public policy decision weighing the interests of living persons against the state's interest in potential life. T.C.A. § 39–15–201 (1991). At least during certain stages of a pregnancy, the personal interests of the pregnant woman outweigh the state's interests and the pregnancy may be terminated.

Taken collectively, our statutes reflect the policy decision that, at least in some circumstances, the interest of living individuals in avoiding procreation is sufficient to justify taking steps to terminate the procreational process, despite the state's interest in potential life.

**27.** The trimester scheme is set forth at T.C.A. § 39–15–201(c)(1)–(3).

ties in parenthood are different in scope than the parental interest considered in other cases. Previously, courts have dealt with the child-bearing and child-rearing aspects of parenthood. Abortion cases have dealt with gestational parenthood. In this case, the Court must deal with the question of genetic parenthood. We conclude, moreover, that an interest in avoiding genetic parenthood can be significant enough to trigger the protections afforded to all other aspects of parenthood. The technological fact that someone unknown to these parties could gestate these preembryos does not alter the fact that these parties, the gamete-providers, would become parents in that event, at least in the genetic sense. The profound impact this would have on them[28] supports their right to sole decisional authority as to whether the process of attempting to gestate these preembryos should continue. This brings us directly to the question of how to resolve the dispute that arises when one party wishes to continue the IVF process and the other does not.

## VII. *Balancing the Parties' Interests*

■ Resolving disputes over conflicting interests of constitutional import is a task familiar to the courts. One way of resolving these disputes is to consider the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions.[29] In this case, the issue centers on the two aspects of procreational autonomy—the right to procreate and the right to avoid procreation. We start by considering the burdens imposed on the parties by solutions that would have the effect of disallowing the exercise of individual procreational autonomy with respect to these particular preembryos.

Beginning with the burden imposed on Junior Davis, we note that the consequences are obvious. Any disposition which results in the gestation of the preembryos would impose unwanted parenthood on him, with all of its possible financial and psychological consequences. The impact that this unwanted parenthood would have on Junior Davis can only be understood by considering his particular circumstances, as revealed in the record.

Junior Davis testified that he was the fifth youngest of six children. When he was five years old, his parents divorced, his mother had a nervous break-down, and he and three of his brothers went to live at a home for boys run by the Lutheran Church. Another brother was taken in by an aunt, and his sister stayed with their mother. From that day forward, he had monthly visits with his mother but saw his father only three more times before he died in 1976. Junior Davis testified that, as a boy, he had severe problems caused by

**28.** Sperm donors may regret not having contact with their biological children, according to psychotherapist Annette Baron and psychologist Aphrodite Clamar, mentioned in Lori Andrews, *Feminist Perspectives on Reproductive Technologist,* American Bar Foundation Working Paper #8701 (1987) footnote 29, also published as Andrews, *Alternative Modes of Reproduction,* in *Reproductive Laws for the 1990s, A Briefing Handbook,* edited by Nadine Taub and Sherrill Cohen, Women's Rights Litigation Clinic, School of Law, Newark (1988). Even more so, women who have surrendered children for adoption may be haunted by concern about the child. Poole, *Allocating of Decision-Making rights to Frozen Embryos,* 4 Amer.J.Family Law 67; 74 (Spring 1990), citing Beeker, *The Rights of Unwed Parents,* 63 Social Services Rev. 496, 508 (1989).

**29.** For instance, in *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the United States Supreme Court addressed the conflicting interests of a city in protecting a doctor who performed abortions and those of the persons who picketed in front of his home. A municipal ordinance prohibited picketing before or about the residence or dwelling of any individual. The Supreme Court had to consider whether the ordinance was narrowly tailored to serve a significant government interest and whether it left open ample alternative channels of communication. *Id.* at 481, 108 S.Ct. at 2500. The Court noted that this ordinance banned only focused picketing before a residence, not all picketing in residential areas. Because it was narrowly tailored to meet a significant government interest of protecting residential privacy, leaving open other methods of protest and expression, the Court held that the statute did not violate the First Amendment. *Id.* at 488, 108 S.Ct. at 2504. Likewise, in this case, we must find some balance between the exercise of the two conflicting interests.

separation from his parents. He said that it was especially hard to leave his mother after each monthly visit. He clearly feels that he has suffered because of his lack of opportunity to establish a relationship with his parents and particularly because of the absence of his father.

In light of his boyhood experiences, Junior Davis is vehemently opposed to fathering a child that would not live with both parents. Regardless of whether he or Mary Sue had custody, he feels that the child's bond with the non-custodial parent would not be satisfactory. He testified very clearly that his concern was for the psychological obstacles a child in such a situation would face, as well as the burdens it would impose on him. Likewise, he is opposed to donation because the recipient couple might divorce, leaving the child (which he definitely would consider his own) in a single-parent setting.

Balanced against Junior Davis's interest in avoiding parenthood is Mary Sue Davis's interest in donating the preembryos to another couple for implantation. Refusal to permit donation of the preembryos would impose on her the burden of knowing that the lengthy IVF procedures she underwent were futile, and that the preembryos to which she contributed genetic material would never become children. While this is not an insubstantial emotional burden, we can only conclude that Mary Sue Davis's interest in donation is not as significant as the interest Junior Davis has in avoiding parenthood. If she were allowed to donate these preembryos, he would face a lifetime of either wondering about his parental status or knowing about his parental status but having no control over it. He testified quite clearly that if these preembryos were brought to term he would fight for custody of his child or children. Donation, if a child came of it, would rob him twice—his procreational autonomy would be defeated and his relationship with his offspring would be prohibited.

The case would be closer if Mary Sue Davis were seeking to use the preembryos herself, but only if she could not achieve parenthood by any other reasonable means.

We recognize the trauma that Mary Sue has already experienced and the additional discomfort to which she would be subjected if she opts to attempt IVF again. Still, she would have a reasonable opportunity, through IVF, to try once again to achieve parenthood in all its aspects—genetic, gestational, bearing, and rearing.

Further, we note that if Mary Sue Davis were unable to undergo another round of IVF, or opted not to try, she could still achieve the child-rearing aspects of parenthood through adoption. The fact that she and Junior Davis pursued adoption indicates that, at least at one time, she was willing to forego genetic parenthood and would have been satisfied by the child-rearing aspects of parenthood alone.

## VIII. *Conclusion*

In summary, we hold that disputes involving the disposition of preembryos produced by *in vitro* fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail.

But the rule does not contemplate the creation of an automatic veto, and in affirming the judgment of the Court of Appeals, we would not wish to be interpreted as so holding.

For the reasons set out above, the judgment of the Court of Appeals is affirmed, in the appellee's favor. This ruling means

that the Knoxville Fertility Clinic is free to follow its normal procedure in dealing with unused preembryos, as long as that procedure is not in conflict with this opinion. Costs on appeal will be taxed to the appellant.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.