**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 30, 2024**

# In the Court of Appeals of Georgia

A24A0841. WOHLERS v. WOHLERS.

WATKINS, Judge.

In this appeal from a final judgment and decree of divorce, Bruce Wohlers, Jr. (the "Husband"), argues that the trial court erred by awarding to Stephanie Wohlers (the "Wife") embryos created in preparation for in-vitro fertilization ("IVF").[1] Because the Husband has failed to show that the trial court abused its discretion, we affirm.

The relevant facts are undisputed. The parties began the IVF process together in 2019, and the Wife had preparatory surgery in October 2019. On January 29, 2020,

---

[1] IVF is the "fertilization of an egg in a laboratory dish or test tube." Specifically IVF involves "fertilization by mixing sperm with eggs surgically removed from an ovary followed by uterine implantation of one or more of the resulting fertilized eggs." www.merriam-webster.com/

she signed an "In-Vitro Fertilization with Embryo Freezing" Agreement and an "Embryo Cryopreservation Consent" form (collectively, the "Agreements") with the Columbus Center for Reproductive Endrocrinology & Infertility, LLC (the "Fertility Clinic"). The parties married two days later, and then on February 12, 2020, the Husband signed the Agreements.

In March, the Husband provided his sperm and assisted the Wife as she underwent daily hormone injections. After eggs were retrieved from the Wife and fertilized with the Husband's sperm, the Wife resumed hormone therapies to prepare for implantation. Around this time, however, the Husband asked for a divorce and then notified the Fertility Clinic that he wanted the embryos destroyed.

A few days later, on June 19, 2020, the Wife filed for divorce. Following an evidentiary hearing in March 2021 at which both parties testified and a final hearing in October 2022 at which both parties presented argument, the trial court entered a final divorce decree. The court awarded the embryos to the Wife, finding that the Agreements did not provide for a disposition of the embryos in the event of a divorce and that the Husband testified that he did not want to have children. We granted the Husband's application for discretionary appeal.

"In the appellate review of a bench trial, we will not set aside the trial court's factual findings unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses. But when a question of law is at issue, we review the trial court's decision de novo."[2]

As the parties argued to the trial court, there are three leading approaches that other jurisdictions have used to resolve custody over frozen embryos: (1) the contemporaneous mutual consent approach; (2) the contractual approach; and (3) the balancing approach.[3]

The contemporaneous mutual consent approach "proposes that no embryo should be used by either partner, donated to another patient, used in research, or destroyed without the contemporaneous mutual consent of the couple that created the

---

[2] (Citations and punctuation omitted.) *Spruell v. Spruell*, 356 Ga. App. 722, 724 (848 SE2d 896) (2020).

[3] See *Smith v. Smith*, 369 Ga. App. 213, 217 (1) (892 SE2d 832) (2023). In *Smith*, this Court did not adopt any particular approach for cases lacking an unambiguous enforceable contract, having concluded that the parties in that case executed an enforceable agreement. Id. at 225 (1) (d).

embryo."[4] As the Wife points out, the trial clearly did not use the contemporaneous mutual consent approach; if it had, it would not have awarded her the embryos.

"Under the contractual approach, courts will enforce contracts governing the disposition of pre-embryos[5] which were entered into at the time of in vitro fertilization so long as they do not violate public policy."[6] In this case, the parties agreed that the court could not use the contractual approach because the Agreements did not provide any guidance. And, significantly, the trial court explicitly noted in its order that "the contract . . . did not provide for a disposition of the embryos in the event of a divorce."

---

[4] *Smith*, 369 Ga. App. at 218 (1) (c) (citations and punctuation omitted) (noting that this process has been criticized as "wholly unrealistic"); see also *Freed v. Freed*, 227 NE3d 954, 968 (6.2) (Ind. App. 2024) ("If parties could agree on their own about the disposition of the pre-embryo upon divorce, they would have no need of the court's intervention.").

[5] In *Smith*, this Court noted that a "[p]re-embryo is a fertilized human egg/ovum in the first fourteen days after fertilization, before implantation in the uterus has occurred." *Smith*, 369 Ga. App. at 218 (1) (a) n. 5. See generally *Davis v. Davis*, 842 SW2d 588, 592-594 (III) (Tenn. 1992) (discussing the biological difference between a pre-embryo and an embryo).

[6] (Citation, punctuation, and footnote omitted.) *Smith*, 369 Ga. App. at 218 (1) (a).

Finally, under the balancing approach, courts resolve the dispute by balancing the parties' interests.[7] Most courts follow the balancing approach where, as the trial court found here, there is no enforceable contract that can resolve the issue.[8] With this framework in mind, we now turn to the Husband's specific claims of error.

1. On appeal, the Husband argues that the Agreements "unambiguously allow either party to withdraw consent to the IVF process at any time"[9] and that the trial

---

[7] *Smith*, 369 Ga. App. at 218 (1) (b). In *Smith*, where the parties' agreement provided that their embryos would be donated if they could not agree on a disposition, this Court used the contractual approach to resolve the parties' dispute over the embryos. Id. at 225 (1) (d). The *Smith* Court declined to adopt any particular approach for cases lacking an unambiguous enforceable contract. Id.

[8] The Supreme Court of New Jersey, however, has adopted the balancing approach as a first step on the ground that "the laws of New Jersey evince a policy against enforcing private contracts to enter into or terminate familial relationships." *J. B. v. M. B.*, 783 A2d 707, 717 (III) (C) (N.J. 2001); see *Bilbao v. Goodwin*, 217 A3d 977, 984-986 (I) (Conn. 2019).

[9] The Embryo Cryopreservation Consent form provides in part:
> I (we) am requesting the [Fertility Clinic] to cryopreserve my/our embryos as a direct result of [IVF]. . . .
> I (we) understand that we may, at any time, request to have my (our) cryopreserved embryos discarded. Such reasons m[a]y include divorce, realization of family size, or I (we) no longer wish to pay storage fees. In any of these events, I (we) understand we must jointly notify the [Fertility Clinic] of our decision. In the event that there is a disagreement between us, the [Fertility Clinic] will maintain the embryos (assuming we continue to pay storage fees) until (we both) agree or until one of us

court thus erred in awarding the embryos to the Wife after the Husband withdrew his consent to continue with IVF.

As the Wife points out in response, however, the Husband failed to preserve this argument for appeal. Crucially, at the final hearing, the Husband's attorney argued that the trial court could not employ the contractual approach to resolve custody of the embryos "[b]ecause the contract doesn't give any guidance." At no point below did the Husband argue that the Agreements allowed him to unilaterally withdraw his consent for the Fertility Clinic to maintain the embryos.

"A party will not be heard to complain of error induced by [his] own conduct, nor to complain of errors expressly invited by [him]. To consider the case on a completely different basis from that presented below would be contrary to the line of cases holding, 'He must stand or fall upon the position taken in the trial court.'"[10] Accordingly, the Husband's first claim of error fails.

---

obtains a binding court order containing direction to the [Fertility Clinic] as to the disposition of the embryos.

In the event of death of one or both spouses, I (we) understand that the surviving spouse or next of kin will take responsibility of the embryos unless other written agreement is obtained.

[10] (Citations and punctuation omitted.) *Mary Allen Realty & Mgmt., LLC v. Harris*, 354 Ga. App. 858, 862 (1) (841 SE2d 748) (2020).

2. The Husband's second enumerated error focuses on his constitutional right not to procreate. To the extent that he is arguing that this principle demands resolution in his favor, the record does not reveal that the Husband clearly raised these constitutional arguments below.

"A constitutional issue cannot be considered when asserted for the first time on appeal but must be clearly raised in the trial court and distinctly ruled upon there. Contentions regarding a constitutional issue which were not made below are thus not passed upon here."[11] At the final hearing, the Husband did argue that he had the "right not to procreate." He asserted that right as part of a balancing test analysis, however, not as a claim that because of his right not to procreate, any ruling not in his favor would be an absolute violation of his constitutional rights. As the Husband failed to clearly raise this argument or obtain a distinct ruling from the trial court, we do not undertake such exercise on appeal.

3. The Husband argues that the trial court abused its discretion by failing to articulate the method it used to arrive at its decision and by failing to identify the precise factors it considered. Based on the record, we discern no abuse of discretion.

---

[11] (Citation and punctuation omitted.) *In the Interest of A. A.*, 253 Ga. App. 858, 862 (3) (560 SE2d 763) (2002).

As the Husband appears to concede, "trial courts generally are not required to make findings of fact in nonjury trials unless requested by one of the parties prior to entry of the judgment."[12] "Absent a showing to the contrary, we presume that the trial court made all required findings, even if the required findings are not specifically set out in the order."[13]

As discussed above, the trial court heard testimony from both parties, including the Wife's testimony about her desire to have children and about the physical, emotional, and financial toll that the IVF process had placed on her. According to the Wife, who was 32 years old at the time of the 2021 evidentiary hearing, she was diagnosed with endometriosis and polycystic ovary syndrome when she was 23 years old. Because she had "always dreamed of having a big family[,]" she saved her "entire

---

[12] *Driver v. Driver*, 292 Ga. 800, 802 (2) (741 SE2d 631) (2013) (citing OCGA § 9-11-52 (a)). See also *Taylor v. Taylor*, 283 Ga. 63, 64 (1) (656 SE2d 828) (2008) ("Inasmuch as the issues on appeal depend upon the factual determinations made by the trial court as factfinder and neither party asked the trial court to make factual findings, we are unable to conclude that the trial court's equitable distribution of marital property was improper as a matter of law or as a matter of fact.") (citation and punctuation omitted).

[13] (Citations and punctuation omitted.) *Benchmark Rehabilitation Partners v. SDJ Logistics*, 367 Ga. App. 203, 205 (3) (885 SE2d 224) (2023).

life" for IVF treatment. She testified that she did not think that she could go through with the process again.

The Husband testified that he was "on board" when the Wife said that she wanted to have children because he "wanted to have a kid." He testified that he later decided that he did not "want to produce a child with this woman[ ]" and that, when he decided he wanted a divorce, he called the Fertility Clinic to have the embryos destroyed. At the final hearing, he argued that because the Wife still had eggs and could still "go through this process again[,]" "her right to procreate should not overcome [his] right not to procreate."

The Husband complains on appeal that the Wife presented no expert medical testimony that this was her "last best hope" to become a mother, but he has presented no support for his assertion that expert testimony was required. Similarly, he has not pointed to anything in the record suggesting that the trial court considered an inappropriate factor before awarding the embryos to the Wife.[14]

---

[14] See, e.g., *In re Marriage of Rooks*, 429 P3d 579, 593-594 (II) (D) (Colo. 2018) (discussing factors that Colorado courts should and should not take into account when awarding embryos in a divorce).

The crux of his argument is that, if the trial court truly had considered all the relevant factors, including one's right not to procreate, it would have resolved this dispute in his favor.[15] As outlined above, there were also factors that weighed in the Wife's favor, and the trial court was not required to make findings of fact on the record. Given the absence of evidence suggesting that the trial court considered any inappropriate factor, we decline to find that the trial court did so. Based on the foregoing, the Husband has thus failed to show that the trial court abused its discretion in awarding the embryos to the Wife.[16] Accordingly, we affirm.

*Judgment affirmed. Doyle, P. J., and Hodges, J., concur.*

---

[15] As part of this argument, the Husband contends that the trial court's "attempt[ ] to absolve [him] of financial responsibility in the event a child was born from the embryos awarded to the [W]ife . . . is contrary to Georgia law." That issue is not ripe for consideration. See *Cheeks v. Miller*, 262 Ga. 687, 688 (425 SE2d 278) (1993) ("The existence of an actual controversy is fundamental to a decision on the merits by this court. A controversy is justiciable when it is definite and concrete, rather than being hypothetical, abstract, academic, or moot.") (citations and punctuation omitted).

[16] See generally *Arthur v. Arthur*, 293 Ga. 63 (743 SE2d 420) (2013).