[663 NYS2d 581]

MAUREEN KASS, Respondent, v STEVEN KASS, Appellant.

Second Department, September 8, 1997

APPEARANCES OF COUNSEL

*Linda T. Armatti-Epstein,* Mineola, for appellant.
*Vincent F. Stempel,* Garden City, for respondent.

**OPINION OF THE COURT**

SULLIVAN, J.

The instant case presents this Court with issues of first impression in New York regarding the status and ultimate disposition of fertilized human ova that are the product of an in vitro fertilization (hereinafter IVF) procedure in which one of the prospective parents no longer wishes to participate. Although the parties have raised, *inter alia,* various fundamental legal and policy arguments in support of their respective positions, we conclude that this controversy is governed by the intent of the parties as clearly expressed in the provisions of an informed consent document which they voluntarily executed as participants in the IVF program and in a subsequent "uncontested divorce" instrument which they executed shortly thereafter, both of which manifest their mutual election that the IVF program should retain the cryopreserved pre-zygotes for approved research purposes under the circumstances of this case. Furthermore, by stipulating to the decision of this matter on submissions, the parties have charted their own course and the plaintiff, not having submitted sufficient evidence to support her contentions, cannot prevail.

**I**

The plaintiff Maureen Kass and the defendant Steven Kass were married on July 4, 1988. Apparently as a result of her in utero exposure to Diethylstilbistrol (DES), the plaintiff experienced difficulty in conceiving a child through coital relations. Accordingly, the parties enrolled in the Long Island IVF program at John T. Mather Memorial Hospital and at that time executed a "General IVF Consent Form No. 1". It is undisputed that the parties underwent 10 unsuccessful attempts to have a child through IVF between March 1990 and June 1993, at a total cost in excess of $75,000. The last of these procedures commenced in May 1993. On May 12, 1993, prior to the procedure, the parties executed a single, seven-page informed consent document dealing with cryopreservation and consisting of two sections, to wit: "INFORMED CONSENT FORM NO. 2: CRYOPRESERVATION OF HUMAN PRE-ZYGOTES", comprising pages one to five of the document, and "INFORMED CONSENT FORM NO. 2—ADDENDUM NO. 2-1: CRYOPRESERVATION—STATEMENT OF DISPOSITION", consisting of pages six and seven. Insofar as relevant, the first section of the document contained the following general language regarding cryopreservation:

### "III Disposition of Pre-Zygotes

"We understand that our frozen pre-zygotes will be stored for a maximum of 5 years. We have the principal responsibility to decide the disposition of our frozen pre-zygotes. *Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of both of us,* consistent with the policies of the IVF Program and applicable law. *In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction. Should we for any reason no longer wish to attempt to initiate a pregnancy, we understand that we may determine the disposition of our frozen pre-zygotes remaining in storage.* * * *

"*The possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes.* THESE IMPORTANT DECISIONS MUST BE DISCUSSED WITH OUR IVF PHYSICIAN AND OUR WISHES MUST BE STATED (BEFORE EGG RETRIEVAL) ON THE ATTACHED ADDENDUM NO. 2-1, STATEMENT OF DISPOSITION. THIS STATEMENT OF DISPOSITION MAY BE CHANGED ONLY BY OUR SIGNING ANOTHER STATEMENT OF DISPOSITION WHICH IS FILED WITH THE IVF PROGRAM" (emphasis supplied).

In the second section of the informed consent document, the parties expressly stated their intent as to the cryopreservation and disposition of the pre-zygotes as follows:

"We understand that it is IVF Program Policy to obtain our informed consent to the number of pre-zygotes which are to be cryopreserved and to the disposition of excess cryopreserved pre-zygotes. *We are to indicate our choices by signing our initials where noted below.*

"1. We consent to cryopreservation of all pre-zygotes which are not transferred during this IVF cycle for possible use in *[sic]* by us in a future IVF cycle. * * *

"2. *In the event that we no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes* and direct the IVF Program to * * *

"(b) *Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program*" (emphasis supplied).

Subsequently, on May 20, 1993, numerous ova were removed from the plaintiff. Two days later, four fertilized ova were implanted in the plaintiff's sister, who had agreed to act as a surrogate. The five remaining pre-zygotes were cryopreserved by the IVF program pursuant to the parties' express wishes as set forth in "ADDENDUM NO. 2-1" of the informed consent document, set forth above.

## II

On June 4, 1993, the parties were advised that a surrogate pregnancy had not resulted from the May 20th procedure, and the plaintiff's sister changed her mind and refused to continue her participation. Their hopes dashed, the parties agreed almost immediately thereafter to dissolve their marriage. Hence, on June 7, 1993, the parties executed a document typed by the plaintiff which provided for an uncontested divorce. Significantly, that instrument set forth their understanding of what they previously had agreed to in the informed consent document with regard to the disposition of the remaining cryopreserved pre-zygotes, as follows: "The disposition of the frozen 5 pre-zygotes at Mather Hospital is that they should be *disposed of [in] the manner outlined in our consent form and that neither Maureen Kass [,] Steve Kass or anyone else will lay claim to custody of these pre-zygotes*" (emphasis supplied).

Notwithstanding the foregoing, the plaintiff changed her mind and, on June 28, 1993, wrote letters to both the hospital and to her IVF physician advising them of the parties' marital difficulties and stating her adamant opposition to the destruction or release of the five pre-zygotes. The plaintiff then commenced this matrimonial action by summons and verified complaint filed July 21, 1993. Among the various items of relief sought therein was the plaintiff's request that she be awarded "sole custody of the frozen fertilized eggs now being held at Mather Memorial Hospital". The plaintiff indicated that she wanted possession of the pre-zygotes so that, rather than having them implanted in her sister as on the previous occasion, the plaintiff herself could undergo yet another IVF implantation procedure. In his verified answer, the defendant opposed both the removal of the pre-zygotes from cryopreservation and any further attempt to achieve a pregnancy, and counterclaimed for specific performance of the parties' election to permit the IVF program to retain the pre-zygotes for study and research, as provided in "ADDENDUM NO. 2-1" of the informed consent document.

By stipulation executed December 17, 1993, the parties resolved all financial and property issues in the matrimonial action, but reserved their rights with respect to the custody and possession of the pre-zygotes. By further stipulation dated April 25, 1994, the parties agreed, *inter alia,* to submit their respective arguments regarding custody or possession of the pre-zygotes to the court for determination. Additionally, on or about January 9, 1995, the parties agreed to rely solely on the papers submitted to the court.

## III

In a memorandum decision dated January 18, 1995, the Supreme Court, Nassau County (Roncallo, J.), ruled in favor of the plaintiff and awarded her possession of the five pre-zygotes. The court began by reasoning that while the pre-zygotes did not have the legal status of "persons", they clearly enjoyed a status above that of mere property. The court went on to determine that a husband's procreative rights in a situation involving in vitro fertilization were no greater than in the case of an in vivo fertilization, such that those rights essentially terminated at the moment of fertilization, making the disposition of the pre-zygotes a matter exclusively within the wife's unfettered discretion. The court further determined that the informed consent document executed by the parties was not dispositive of the controversy and merely provided that in the event of divorce, a court was to decide the matter. The court also reasoned that the disposition chosen by the parties in "ADDENDUM NO. 2-1" of the informed consent document was not applicable in "a divorce situation". Finally, the court determined that the parties' "uncontested divorce" agreement of June 7, 1993, which never became operative, did not constitute a waiver by the plaintiff of "her right to determine the future of the subject zygotes". By judgment entered February 23, 1995, the court (Davis, J.) granted the plaintiff "the exclusive right to determine the fate of the subject pre-embryos", including their utilization in another attempt to achieve pregnancy. This appeal by the defendant ensued. On May 26, 1995, the judgment was stayed pending the determination of this appeal. For the reasons which follow, we disagree with the Supreme Court's resolution of the matter and instead find that the parties' mutual intent regarding the disposition of the pre-zygotes, expressed in the informed consent document executed contemporaneously with the last IVF procedure and in the uncontested divorce instrument, should be given effect.

## IV

We begin our analysis with the observation that all of the members of this panel, including the concurring and the dissenting Justices, agree that the Supreme Court committed a fundamental error in equating a prospective mother's decision whether to undergo implantation of pre-zygotes which are the product of her participation in an IVF procedure with a pregnant woman's right to exercise exclusive control over the fate of her nonviable fetus. It is well settled that the latter authority is premised on the woman's right to privacy in the area of reproductive choice. That right is set forth in *Roe v Wade* (410 US 113), a case which may be viewed as "a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection" *(Planned Parenthood v Casey,* 505 US 833, 857; *see, Planned Parenthood v Danforth,* 428 US 52). A woman's established right to exercise virtually exclusive control over her own body is not implicated in the IVF scenario until such time as implantation actually occurs, for it is only then that her bodily integrity is at issue *(see, Davis v Davis,* 842 SW2d 588, 601 [Tenn], *cert denied sub nom. Stowe v Davis,* 507 US 911). Prior to implantation, that interest is not a relevant and appropriate consideration, and a court must pursue other analytical avenues in determining whether implantation over the objection of one of the parties should be permitted or precluded. We find that the first such inquiry should be directed at whether the parties have made an expression of mutual intent which governs the disposition of the pre-zygotes under the circumstances in which the parties find themselves.

## V

In the case before us, the Supreme Court, Nassau County, and the parties have devoted much effort to discussing the decision of the Supreme Court of Tennessee in *Davis v Davis (supra).* Decided June 1, 1992, *Davis v Davis* was the first decision of an appellate court to address the thorny issue of the effect of divorce on cryopreserved pre-zygotes. Indeed, that case bears some strong factual similarities to the matter at bar. Junior Davis and Mary Sue Davis, like the Kasses herein, participated in an IVF program as husband and wife and underwent a number of failed attempts to achieve a viable pregnancy. Junior subsequently filed for a divorce while seven of the parties' cryopreserved fertilized ova were still in storage

at a fertility clinic. All matters raised in the divorce action were resolved except for the question of the disposition of the fertilized ova. Mary Sue sought custody of them, initially for the purpose of having them implanted in herself, but, following her remarriage during the pendency of the litigation, for the purpose of donating them to a childless couple. Junior vehemently opposed any implantation. Confronted with this conflict between the procreative rights of the parties, the court in *Davis* discussed at length the variety of possible analytical approaches which were advocated by authors of diverse legal journals and other publications as appropriate for resolving disputes of this nature. The court found that the gamete providers should be afforded complete control over the disposition of the fertilized ova and that the parties must be considered equivalent gamete providers. Moreover, eschewing the application of any bright-line test in situations where the gamete providers cannot agree on a disposition, the court adopted an analysis in which the respective interests of the parties in attempting and avoiding procreation must be balanced in order to determine which interest should prevail under the particular facts of a given case. The court then found that the interest of Junior Davis in avoiding procreation was greater than the interest of Mary Sue Davis in donating the fertilized ova to a childless couple. The court stated its approach as follows: "the relative interests of the parties in using or not using the preembryos must be weighed. Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered" *(Davis v Davis,* 842 SW2d 588, 604, *supra).*

The weighing of interests employed in *Davis* constitutes an analysis which may be worthy of some consideration in resolving conflicts between gamete providers over the disposition of their fertilized ova. However, there is no need to decide whether such an analysis should be adopted in the present case because, unlike the situation in *Davis,* the parties herein executed an informed consent document and an uncontested divorce instrument in which they unequivocally stated their intent as to the manner of disposition of the subject pre-zygotes. Indeed, throughout its decision, the court in *Davis* bemoaned the absence of such a statement of mutual intent in that case and clearly stated that the weighing of interests should only be utilized where no such manifestation of intent exists:

"At the outset, it is important to note the absence of [a] critical factor [ ] that might otherwise influence or control the result of this litigation: When the Davises signed up for the IVF program at the Knoxville clinic, they did not execute a written agreement specifying what disposition should be made of any unused embryos that might result from the cryopreservation process" *(Davis v Davis, supra,* at 590).

"We believe, as a starting point, that *an agreement regarding disposition of any untransferred preembryos in the event of contingencies* (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) *should be presumed valid and should be enforced as between the progenitors. This conclusion is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the preembryos, retain decision-making authority as to their disposition.*

"At the same time, we recognize that life is not static, and that human emotions run particularly high when a married couple is attempting to overcome infertility problems. It follows that the parties' initial 'informed consent' to IVF procedures will often not be truly informed because of the near impossibility of anticipating, emotionally and psychologically, all the turns that events may take as the IVF process unfolds. Providing that the initial agreements may later be modified *by agreement* will, we think, protect the parties against some of the risks they face in this regard. But, *in the absence of such agreed modification, we conclude that their prior agreements should be considered binding." (Davis v Davis, supra,* at 597 [emphasis supplied].)

"In summary, we hold that *disputes involving the disposition of preembryos produced by in vitro fertilization should be resolved, first, by looking to the preferences of the progenitors.* If their wishes cannot be ascertained, or *if there is [a] dispute, then their prior agreement concerning disposition should be carried out.* If no prior agreement exists, [only] then [should] the relative interests of the parties in using or not using the preembryos * * * be weighed" *(Davis v Davis, supra,* at 604 [emphasis supplied]).

We are in full agreement with the decision in *Davis* to the extent it requires that where a manifestation of mutual intent exists between the parties, that intent must be given effect by the court. Since we conclude, in accordance with the analysis employed in *Davis,* that the agreement of the parties is dispositive of the present controversy, no further discussion of the facts of that case is material or relevant.

## VI

Turning to the record before us, we find that such an unequivocal statement of intent exists in this case by reason of the parties' execution of the aforementioned informed consent document. Indeed, reading that document as a whole *(see, Hudson-Port Ewen Assocs. v Chien Kuo, 78 NY2d 944; Sunrise Mall Assocs. v Import Alley, 211 AD2d 711)*, it is clear from the tenor of its language as well as from its liberal use of the words "we", "us", and "our" that the parties' very participation in the IVF program is premised on their status as a married couple committed to a single joint decision to use IVF in an attempt to achieve parenthood. Indeed, in paragraph III—"Disposition of Pre-Zygotes"—of Informed Consent Form No. 2, it is expressly stated: "Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of *both* of us, consistent with the policies of the IVF Program and applicable law" (emphasis supplied). Moreover, at numerous points throughout the document, the parties, as a married couple, acknowledge their joint right and obligation to provide for the disposition of any stored pre-zygotes in the event that they cannot render such a joint decision at some point in the future. Significantly, the only specific dispositional language in the entire informed consent document appears at page six of that instrument, where the parties jointly state their intention to permit the IVF program to retain the pre-zygotes for approved research and investigation in the event that they are unable to make a decision regarding the disposition of the pre-zygotes. Since the parties now in fact no longer agree with regard to this matter, they are no longer able to render the single, joint decision regarding the disposition of the pre-zygotes which the informed consent document contemplated. Accordingly, their prior statement as to disposition, as set forth at page six of the informed consent document, should be given effect according to its clear and unambiguous terms *(see, Davis v Davis, 842 SW2d 588, supra; see generally, W.W.W. Assocs. v Giancontieri, 77 NY2d 157)*. Given these circumstances, we agree with the defendant's position that the pre-zygotes must be retained and used by the IVF program for scientific purposes, a result consistent with the parties' expressed wishes.

## VII

The plaintiff has posited two arguments, both accepted by the Supreme Court and embraced by our concurring and dissenting colleagues, in an attempt to avoid the foregoing result.

First, she contends that the statement of intent can only be considered in the event of death or incapacity, since a reference to the dispositional provision at page three of the document is preceded by the statement: "[t]he possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes". The argument is unavailing. Indeed, there is absolutely nothing in the document to suggest that the parties' expression of intent should be given effect only in the event of death or incapacity, nor is there any language which precludes the parties' divorce and their disagreement over continued participation in the IVF program from constituting "unforeseen circumstances" which would render them unable to make a dispositional decision and thus necessitate reference to their prior statement of intent. Rather, the overly narrow interpretation advocated by the plaintiff is refuted not only by the broad language of the dispositional provision itself, but by other provisions of the informed consent document as well. For example, page three also contains the following sentence: "[s]hould we *for any reason* no longer wish to attempt to initiate a pregnancy, we understand that we may determine the disposition of our frozen pre-zygotes remaining in storage" (emphasis supplied). Put another way, the plaintiff and our concurring and dissenting colleagues are treating the "death or any other unforeseen circumstances" language as a condition precedent which has not been fulfilled. They are wrong in doing so. As a general rule, it must clearly appear from the agreement itself that the parties intended a provision to operate as a condition precedent *(see,* 22 NY Jur 2d, Contracts, § 265; *Lui v Park Ridge at Terryville Assn.,* 196 AD2d 579). If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent *(see, Lui v Park Ridge at Terryville Assn., supra,* at 582; *Manning v Michaels,* 149 AD2d 897).

In view of the foregoing, and in keeping with the spirit and tenor of the entire document, we find that the provision cited by the plaintiff is rationally interpreted to mean that death and incapacity are merely examples of contingencies which will prevent a joint decision and will therefore render consideration of the parties' expression of intent appropriate, but they are not the only events which will do so.

The plaintiff's second argument in this regard is that the informed consent document expressly addresses the disposition

of the pre-zygotes should a divorce occur, and thus renders the parties' manifestation of mutual intent in "ADDENDUM NO. 2-1" inapplicable. The sentence upon which she relies to support this assertion states: "[i]n the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction". Contrary to the plaintiff's contention, this language does not constitute a dispositional provision at all. Rather, it is intended to confer jurisdiction on the court (an interpretation which the plaintiff herself advocated in the Supreme Court), and it is clearly designed to insulate the hospital and the IVF program from liability in the event of a legal dispute over the pre-zygotes arising in the context of a divorce. Significantly, the quoted provision *does not mandate any particular disposition of the pre-zygotes*—it merely provides that they will not be released from storage absent a court order directing same. Hence, while this provision may govern the jural relationship between the parties and the IVF program, it does not alter the fact that the parties intended that if they were unable to agree upon a disposition of the pre-zygotes in the future, the pre-zygotes should be retained by the IVF program for research purposes. This provision relative to divorce did not confer on the court the right to ignore the unambiguous agreement of the parties as to the disposition of the pre-zygotes and to de novo create its own disposition based on what it believed was a more equitable determination. The Supreme Court did not have this authority, nor do we.

In short, the plaintiff may not invoke a provision drafted for the purpose of protecting the hospital and the IVF program to subvert a clear and unequivocal expression of intent which she and the defendant made together contemporaneously with the last IVF procedure. At most, the divorce provision at page three of the informed consent document would permit the parties to modify their statement of intent by entering into a "property settlement" which included a new joint decision regarding the disposition of the pre-zygotes. Since no such settlement was in fact made and the parties fully anticipated that the courts would enforce their agreement, the manifestation of their intent in the informed consent document should be viewed as controlling.

We further note that even if one provision of the informed consent document could rationally be perceived as creating an ambiguity regarding the circumstances under which the par-

ties' statement of mutual intent was to apply, any such ambiguity may be resolved by reading that document as a whole to determine its purpose and intent *(see, Hudson-Port Ewen Associates. v Chien Kuo,* 78 NY2d 944, 945, *supra; see also, W.W.W. Assocs. v Giancontieri,* 77 NY2d 157, *supra; Hartford Acc. & Indem. Co. v Wesolowski,* 33 NY2d 169). Viewing the informed consent document in its entirety, we conclude that, regardless of whether it is sufficient to constitute a binding contract, it provides irrefutable evidence that the parties intended to have the IVF program retain the stored pre-zygotes for study in the event that, as here, they were unable to jointly agree on continued participation in the program. Indeed, any doubts as to how the parties viewed the informed consent document they signed, particularly as to their intent in providing for the disposition of the remaining pre-zygotes, are dispelled by the actions and words of the parties in drafting and signing the "uncontested divorce" instrument less than one month after they executed the informed consent document. In that uncontested divorce instrument, the parties expressed their mutual desire to divorce and further reaffirmed their intention that the pre-zygotes should be disposed of by the IVF program in the manner set forth in their informed consent document, and that neither party would seek possession of them. While the uncontested divorce instrument never became operative, it constitutes compelling evidence that the parties, in executing the informed consent document, intended to authorize the use of the pre-zygotes by the IVF program for research purposes in the event that they could no longer agree on their disposition because of divorce or any other reason. These repeated statements of intent by the parties merit serious consideration and are entitled to great deference.

## VIII

In addition to the clear right of the defendant to obtain specific performance of the agreed disposition of the pre-zygotes, there is another, more fundamental flaw in the proposal of the dissent to remit this matter for further proceedings. Contrary to the dissenters, no member of this Bench has set forth any new evidentiary thresholds for the plaintiff to meet. Each analytical approach and evidentiary standard advocated in the plurality, concurring, and dissenting opinions is taken directly from the discussion by Justice Daughtrey in the decision in *Davis v Davis* (842 SW2d 588, *supra).* These evidentiary thresholds were well known and extensively discussed

in academic and legal literature prior to the advent of this litigation. Moreover, in the memorandum of law submitted by the plaintiff to the Supreme Court and in her own supporting affidavit, the plaintiff argued that these pre-zygotes represent her best and perhaps last chance to become pregnant. This was the very argument expressly suggested and anticipated in *Davis*. Although the plaintiff submitted 170 pages of exhibits, including her complete medical records, even the dissenters agree that the record is "insufficient to permit a fair balancing of the salient considerations". To the extent that this statement constitutes an acknowledgment that there has been a failure of proof on the plaintiff's part, we are in agreement with our colleagues. In short, despite her awareness of the balancing test employed in *Davis*, and her express reliance on that decision at the Supreme Court, the plaintiff has not provided sufficient proof to establish any right to custody of the frozen pre-zygotes in the absence of the consent of her former husband.

It is beyond question that unless public policy is violated, the parties to any litigation are free to chart their own procedural course *(see, Mitchell v New York Hosp.*, 61 NY2d 208, 214; *T. W. Oil v Consolidated Edison Co.*, 57 NY2d 574, 579-580), and they may fashion the basis upon which a particular controversy is to be resolved *(see, Cullen v Naples*, 31 NY2d 818, 820). Here the parties did precisely that, and the dissent fails to identify any public policy interest which was violated thereby. On January 9, 1995, the attorneys for both sides submitted a letter to Justice Roncallo agreeing that the matter should be determined on the submissions. On January 17, 1995, the plaintiff's attorney indicated that the last affidavit had been submitted. The record upon which we must rule was thereby established. As the dissenters state, that record is insufficient to afford the plaintiff the relief she seeks. However, since the parties charted their own course, neither the plaintiff nor the dissenters can now change the rules simply because they are unhappy with the outcome *(see, Rector of St. Bartholomew's Church v Committee to Preserve St. Bartholomew's Church*, 56 NY2d 71, 76).

## IX

In conclusion, we find that the decision to attempt to have children through IVF procedures and the determination of the fate of cryopreserved pre-zygotes resulting therefrom are intensely personal and essentially private matters which are appropriately resolved by the prospective parents rather than the courts. Accordingly, where the parties have indicated their

mutual intent regarding the disposition of the pre-zygotes in the event of the occurrence of a contingency, that decision must be scrupulously honored, and the courts must refrain from any interference with the parties' expressed wishes. The documentary evidence overwhelmingly demonstrates that the parties in this case made such a clear and unequivocal choice, and the plaintiff's subsequent change of heart cannot be permitted to unilaterally alter their mutual decision. Accordingly, the judgment is reversed, on the law, with costs, and the matter is remitted to the Supreme Court, Nassau County, for entry of a judgment directing that the disposition of the five pre-zygotes shall be in accordance with paragraph 2 (b) of Addendum No. 2-1 of the parties' informed consent agreement.

FRIEDMANN, J. (concurring). I concur with the result reached by my plurality colleagues, namely that, without benefit of a hearing, the disposition of the frozen pre-zygotes at issue here should be in accordance with "Addendum No. 2-1" of the parties' informed consent document. However, I write separately because I do not agree that the informed consent document is sufficiently unambiguous to determine the disposition of the pre-zygotes based solely on the terms of that agreement.

## I

Initially, I agree with the plurality that procreational decisions are "intensely personal" and should, where possible, be resolved by the implementation of the parties' intentions. However, I do not believe that the informed consent document relied on here provides real insight into the intentions of these divorced parties.

The plurality urges that the parties had resolved to donate their frozen pre-zygotes to research in any instance where they ceased to agree on the disposition of the fertilized eggs, including during a divorce. In reaching this conclusion, they principally rely upon Addendum No. 2-1 of the parties' informed consent contract with the IVF laboratory (hereinafter the IVF contract) which they initialed, and which provides: "[i]n the event that we no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes * * * [o]ur frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program".

However, to the extent that the instant IVF contract has an intelligible structure, it appears to be chronological, i.e., it fol-

lows the anticipated schedule of a couple's relationship with the laboratory, from the time the hopeful pair enters the door until their dealings with the program are concluded. The provision invoked by the plurality occurs in a section towards the end of the document which seems designed to address what the IVF laboratory could do with "left over" pre-zygotes after a couple's association with the program has terminated, either because the wife has successfully borne a child or because the pair has decided to discontinue their efforts to conceive by means of IVF. The laboratory might therefore find itself with excess pre-zygotes in circumstances where the departing clients have failed to issue instructions on how they want their pre-zygotes disposed of, or where they find themselves unable to agree upon such instructions. To protect itself, the laboratory requires its clients to indicate in advance their preference as to the disposition of the residual pre-zygotes. It is this provision that is clearly designed to insulate the IVF program from liability, in the event that it is later sued for having disposed of a former client's pre-zygotes in an allegedly unauthorized fashion.

My plurality colleagues conjecture that the provision in the IVF contract to donate any "excess" pre-zygotes to research is the provision referred to in the parties' preliminary "Uncontested Divorce" agreement of June 7, 1993, in which the couple declared that "the frozen 5 pre-zygotes at Mather Hospital * * * should be disposed of [in] the manner outlined in our consent form". However, it is by no means clear that the parties agreed on the "manner" of disposition. In addition, the June 7, 1993 agreement was superseded on December 17, 1993, by a new "Stipulation Pursuant to Divorce", wherein the parties reserved their rights to pursue the "ongoing litigation with respect to the custody of eggs".

This "ongoing litigation" seems to be sanctioned by the sole paragraph in the IVF contract to expressly address what should happen in the event of divorce, namely: "In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction". This sentence, which is admittedly not free from ambiguity, suggests that in the event of divorce the parties hoped to arrive at a "settlement" agreement with respect to the stored pre-zygotes, but that, failing such an agreement, they committed the ultimate decision regarding disposition of their frozen fertilized eggs to the court.

In short, the IVF contract before us is susceptible of multiple and conflicting interpretations, with the result that, in my opinion, it cannot logically be relied upon to resolve the instant dispute. We are therefore squarely presented with the issue addressed by the court in *Davis v Davis* (842 SW2d 588 [Tenn], *cert denied sub nom. Stowe v Davis,* 507 US 911), namely, how to dispose of a divorced couple's frozen pre-zygotes, where the parties cannot agree and there is no intelligible written contract declaring their intentions.

## II

I cannot accept the strict balancing of interests approach favored by the *Davis* court and my dissenting colleagues. Rather, I am persuaded that where, as here, there is no reliable contract providing for the disposition of the frozen pre-zygotes, the objecting party, except in the most exceptional circumstances, should be able to veto a former spouse's proposed implantation.

The *Davis* court, which favored a balancing of the parties' interests in the absence of a contract governing the disposition of frozen pre-zygotes in the event of divorce, clearly inclined to the opinion that "[o]rdinarily, the party wishing to avoid procreation should prevail" *(Davis v Davis, supra,* at 604).

However, the *Davis* court deserted its own balancing of interests test when it suggested that the wife's position would be strengthened where, as here, she desires to have the pre-zygotes implanted in her own body rather than in someone else's *(Davis v Davis, supra,* at 604; *see, e.g.,* Robertson, *In the Beginning: The Legal Status of Early Embryos,* 76 Va L Rev 437, 479-483 [1990] [hereinafter Robertson, *In the Beginning]).* I believe that the *Davis* dicta, if implemented, would collide with the Supreme Court's holding in *Planned Parenthood v Danforth* (428 US 52), that no person or entity should be allowed to interfere with another person's decision not to have offspring before the point of viability *(see also,* Robertson, *In the Beginning, op. cit.,* at 468).

## III

In my view, an objecting party's right to veto implantation is supported, in the first instance, by fundamental constitutional considerations. As the *Davis* court reasoned, the right of "procreational autonomy" *(Davis v Davis, supra,* at 601), implicit in the constitutional guarantees of liberty and privacy includes both "the right to procreate and the right to avoid procre-

ation" *(Davis v Davis, supra,* at 601; *see also, Carey v Population Servs. Intl.,* 431 US 678; *Roe v Wade,* 410 US 113; *Eisenstadt v Baird,* 405 US 438; *Griswold v Connecticut,* 381 US 479; *Meyer v Nebraska,* 262 US 390; Note, *To Have or Not To Have: Whose Procreative Rights Prevail in Disputes Over Dispositions of Frozen Embryos?,* 27 Conn L Rev 1377, 1395 [1995] [hereinafter Note, *Procreative Rights]).* When these two rights are in conflict, authorities have sought a resolution by "balancing the burdens imposed on each party by [the] exercise of the other's right" (Note, *Procreative Rights, id.,* at 1402). When this is done as in the case before us, however, it is clear to me that there can be few situations, if any, where the burden upon the party forced to forfeit using particular pre-zygotes to acquire offspring will outweigh the burden upon the party who wishes to avoid reproduction but is compelled by court order to become a parent.

Once lost, the right not to procreate can never be regained. It is the irrevocability of parenthood that is most crushing to the unconsenting gamete provider; and it is principally because of this that I find it hard to imagine a situation where a court should undertake to foist parenthood upon an unwilling individual *(see, e.g., Matter of Baby Boy C.,* 84 NY2d 91). "Once a child is born, there is no way to end biological ties, and very few ways to end emotional ones" (Note, *Davis v Davis: An Inconsistent Exception to an Otherwise Sound Rule Advancing Procreational Freedom and Reproductive Technology,* 43 DePaul L Rev 523, 566 [1994]). Put somewhat differently, "[e]ven if no rearing duties or even contact result[s], the unconsenting partner [former spouse] will know that biologic offspring exist, with the powerful attendant reverberations of guilt, attachment, or responsibility which that knowledge can ignite" (Robertson, *In the Beginning, op. cit.,* at 479).

## IV

Practical and policy concerns also militate against pre-zygote implantation under circumstances where the marital relationship has dissolved and one gamete provider objects. For example, New York State imposes an unwaivable duty upon most biological parents to support their offspring, regardless of how they were conceived *(see, e.g., Matter of L. Pamela P. v Frank S.,* 59 NY2d 1). Even assuming that the wife at bar intends in good faith to bear all of the expenses of child-rearing on her own, unforeseen circumstances can always arise capable of causing the child's needs to exceed the mother's re-

sources. Who, for example, would care for the child (or children, since multiple births are not uncommon in IVF pregnancies) if the mother became impoverished, fell ill, was disabled, or died? What if the child was afflicted with a serious malady requiring expensive treatments or therapies that the mother could not afford? It cannot seriously be supposed that the State would or should accept responsibility for the child under such circumstances, while a solvent parent survives *(see, e.g.,* Family Ct Act §§ 413, 415, 513; *Matter of Harvey-Cook v Neill,* 118 AD2d 109).

## V

Although I do not disagree with my dissenting colleagues that the IVF agreement is ambiguous, I do not consider that a dispositional hearing as suggested by them is warranted. It is my belief that the party seeking to implant the pre-zygotes—here the former wife—should be required to establish as a threshold matter that she cannot undergo IVF with a new partner or a sperm donor because, for example, she has lost her ability to ovulate or has some other major medical contraindication to egg retrieval *(see, e.g.,* Robertson, *Prior Agreements for Disposition of Frozen Embryos,* 51 Ohio St L J 407, 413, 419 [1990]; *see also,* Robertson, *In the Beginning,* 76 Va L Rev, *op. cit.,* at 479). Mere discomfort, expense, or other potentially surmountable difficulties should not suffice to defeat the defendant's fundamental right to avoid biological fatherhood in a case of this sort. In addition, adoption should be regarded as among the "other reasonable alternatives" to pre-zygote implantation. The wife's mere preference for genetic parenthood should not override her former spouse's prerogative to elect not to procreate in circumstances such as these (Note, *Procreative Rights,* 27 Conn L Rev, *op. cit.,* at 1403-1404). Only following a prima facie showing by the plaintiff that she lacks all other means of achieving genetic parenthood and that adoption is not a feasible or satisfactory option for her should the hearing recommended by the dissent be held.

However, in the matter before us, as justification for the former wife's wish to implant the frozen pre-zygotes, she has contended only that she has a medical condition that makes it difficult for her to conceive and carry a child to term, and that as an unmarried person in her late thirties she would not find it easy to recommence the IVF process. She has not alleged that further IVF efforts with another donor would be unavailing, and she has not addressed the adoption issue at all. In my

opinion, she has failed to satisfy her threshold burden. In the absence of a prima facie demonstration (not mere allegation) that the pre-zygotes in question represent her last and only chance at motherhood, the plaintiff should not be entitled to a hearing, the ultimate purpose of which should be to establish the exigency of her situation and to explore why, even given such exigency, her desires should prevail over the conflicting wishes of her former spouse. Indeed, as the plurality points out, the plaintiff has effectively proven on the instant record that she could not make the necessary showing of exigency even if she were afforded the opportunity. This is because, notwithstanding her ostensible reliance upon the *Davis v Davis* balancing test and her agreement to have the instant dispute resolved on papers, her submissions to date have been unconvincing, as even the dissent essentially concedes.

## VI

In summary, although I do not believe that the parties' informed consent agreement provides the guidance to their intentions that the plurality perceives, I concur that judgment should be granted to the defendant. Moreover, because the defendant has throughout the course of this litigation expressed his desire that the contested pre-zygotes be used by the IVF program in approved research studies, I join with my plurality colleagues in sanctioning this disposition.

MILLER, J. P. (dissenting). To be or not to be a parent? In this case of first impression at the appellate level in New York, two potential parents seek two different dispositions of fertilized ova they created. No longer married, the ex-wife nevertheless continues to seek motherhood by implantation of the ova, while the ex-husband seeks their destruction in order to avoid unwanted parenthood following the parties' divorce. The legal, emotional, and ethical nightmare resulting demonstrates the clear need for legislation mandating that in vitro fertilization clinics require the execution of a standardized, binding agreement setting forth the parties' specific intentions in the event of foreseeable changes in circumstances, and possibly for legislation altering the parent status of the party objecting to parenthood to that of a sperm donor, thereby avoiding potential child support obligations.

Unfortunately, in the case before us, although the parties did enter into an "informed consent" document, it failed to provide an unambiguous statement of their intent. In this

regard I wholeheartedly concur with Justice Friedmann's analysis in his concurring opinion (hereinafter the concurrence) and vigorously dispute Justice Sullivan's contention in his plurality opinion (hereinafter the plurality) that the agreement in issue, by any stretch of the imagination, reflects the intent of these parties to destroy their pre-zygotes in the event of divorce.

However, I disagree with the concurrence insofar as it concludes that the ex-husband's rights must prevail as a matter of law, and serve as a veto over the ex-wife's competing interests. In my view the parties' competing wishes in regard to the disposition of the pre-zygotes should be decided only after a careful balancing of their respective rights, their circumstances, and their competing equities. As there was no trial conducted in this matter, and the Supreme Court's determination was based solely upon the parties' motion papers and memoranda of law, the record is insufficient to permit such a proper balancing of the equities. The issues before us are of such monumental consequence that a careful ad hoc analysis is merited. Accordingly, I would remit this matter for further proceedings, so as to provide a sufficient record to adequately assess the parties' competing interests.

It is noteworthy that my colleagues and I are in unanimous agreement in regard to two major issues. First, that the Supreme Court erred in equating a woman's procreational right to attain pregnancy via in vitro fertilization with her right to bodily autonomy attendant to an in vivo pregnancy. Secondly, that where the parties have expressed their agreement by contract, their intentions should control and that such agreements should be encouraged if not mandated.

## I

The plurality provides a concise and adequate statement of the facts underlying this appeal. I would merely add some details explaining the procedures that must be endured by a woman undergoing in vitro fertilization (hereinafter IVF).

IVF requires that ovum production be stimulated in a woman through the administration of fertility drugs. The eggs are then retrieved either via laparoscopic surgery or ultrasound-aided, needle aspiration (see, Note, *Davis v Davis: What About Future Disputes*, 26 Conn L Rev 305, 307 [1993] [hereinafter Note, *Future Disputes]*). The eggs are then exposed to sperm in a petri dish where fertilization will take place (see, Note, *Future Disputes, id.,* at 307). Three or four fertilized eggs

may be transferred to the uterus where at least one will hopefully implant in the uterine lining achieving pregnancy *(see,* Note, *Future Disputes, id.,* at 308; Comment, *Frozen Embryos: Towards an Equitable Solution,* 46 U Miami L Rev 803, 806 [1992]; Robertson, *Prior Agreements for Disposition of Frozen Embryos,* 51 Ohio St L J 407, n 3 [1990] [hereinafter Robertson, *Prior Agreements]).*

The IVF process is physically painful, emotionally draining, and financially burdensome *(see,* Note, *Future Disputes,* 26 Conn L Rev, *op. cit.,* at 308; Note, *The Davis Dilemma: How to Prevent Battles Over Frozen Preembryos,* 41 Case W Res L Rev 543, 548 [1991] [hereinafter Note, *Davis Dilemma]).* Indeed, the parties in the instant matter reportedly spent in excess of $75,000 in their quest for conception. To minimize the toll taken on the parties to the IVF process, particularly the woman, ovarian stimulation intentionally results in the production and retrieval of a greater number of eggs than can be safely implanted in any one procedure (Note, *Davis Dilemma, op. cit.,* at 548). Accordingly, the IVF process now frequently includes cryopreservation: the dehydration and freezing of pre-zygotes which permits them to be stored for later use *(see,* Robertson, *Prior Agreements,* 51 Ohio St L J, *op. cit.,* at 408). While cryopreservation may facilitate various aspects of the IVF process, it carries with it the risk that between the time of fertilization and implantation, intervening events may cause one or both of the participants to change their minds.

## II

Before the Supreme Court, Nassau County, the ex-wife moved for pendente lite relief, including a temporary restraining order to enjoin the ex-husband from destroying the pre-zygotes. The ex-husband cross-moved to enjoin the ex-wife from gaining access to the pre-zygotes to prevent their implantation. He contended that pursuant to the terms of the disposition provisions of an addendum to the informed consent document, the parties agreed that in the event they no longer wanted to complete the IVF process the pre-zygotes would be donated for scientific research as expressly provided for in the addendum. The ex-husband argued that while he consented to participation in the IVF procedure with his (then) wife so they might achieve the parenthood they both desired as a couple, he vehemently opposed the ex-wife's attempt to bear "unwanted * * * genetic offspring, out of wedlock" which would constitute an "enormous emotional, psychological and financial burden

upon [him]". The ex-wife opposed the cross motion, *inter alia,* arguing that the addendum did not provide for the disposal of the pre-zygotes, but that pursuant to the provisions of the informed consent document, in the event of divorce the disposition of the pre-zygotes would be left to the court to decide.

By pendente lite order dated November 18, 1993, the court, on consent of the parties, enjoined either party from gaining access to the pre-zygotes. By stipulation dated April 25, 1994, the parties settled all marital and financial issues pursuant to the provisions of a written agreement. The stipulation, however, further recited that issues concerning the possession of the pre-zygotes would be decided by the court. On May 16, 1994, the court signed a judgment of divorce.

With only the "custody" issue remaining, the ex-wife submitted a lengthy memorandum of law wherein she reiterated her contention that the parties had not provided for the disposition of the pre-zygotes via the informed consent form. Furthermore, in accordance with the opinion of the Supreme Court of Tennessee in *Davis v Davis* (842 SW2d 588, *cert denied sub nom. Stowe v Davis,* 507 US 911), she argued that constitutional protections embracing her freedom to procreate compelled that after balancing the parties' respective interests, she should be permitted to implant the pre-zygotes. By having agreed to participate in the IVF procedure and by her detrimental reliance thereupon, the ex-wife contended that an implied contract existed pursuant to which the ex-husband was estopped from contesting her decision to implant the pre-zygotes. She also pleaded in an accompanying affidavit that at age 36, and with no prospects of a quick remarriage, implantation of the remaining, frozen pre-zygotes represented her "best and possibly, last opportunity to bear a child".

The ex-husband challenged the ex-wife's estoppel argument by pointing out that the agreement to procreate via IVF was one he and his ex-wife reached as a couple, during their marriage. He argued that any implied contract that might have once existed had been abrogated upon the parties' separation and divorce. He further pointed out that his ex-wife's decision to have his child postwedlock exposed him to the obligation to financially support the child. He contended that because he could not avoid the financial obligations of unwanted fatherhood, an unfair burden would be placed upon him which was "tantamount to * * * being forced to procreate" with the ex-wife. The ex-husband also cited *Davis v Davis (supra)* to contend that a balancing of the equities in this case clearly

favored his decision to prevent the ex-wife from attempting to implant and give birth. He again reiterated his contentions that the informed consent document was a contract between the parties pursuant to which they agreed to donate the pre-zygotes to scientific research in the event of a divorce.

## III

The issues addressed herein are of first impression at the appellate level in this State. Indeed, there is a dearth of decisional authority regarding controversies over the products of in vitro fertilization. *Davis v Davis (supra)* appears to be the first American case to recognize, in an IVF context, that there are both fundamental rights to procreate and to avoid procreation. Prior to *Davis* the law struggled with difficult issues with little guidance as to the disposition of pre-zygotes.

For example, in the unreported decision of *Del Zio v Columbia Presbyt. Med. Ctr.* (US Dist Ct, SD NY, Apr. 12, 1978, No. 74-3558) a female IVF patient was awarded damages to compensate her for the destruction of her eggs *(see also, Davis v Davis, supra,* at 602, n 25). *York v Jones* (717 F Supp 421) presented a controversy between the progenitors of a frozen pre-zygote and a Virginia reproductive medicine facility which refused to transfer the pre-zygote to a different facility in California. The court enforced the "parents" rights under a bailment analysis.

Few States have enacted laws attempting to regulate IVF or to deal with its ethical implications *(see,* Note, *Davis v Davis: The Applicability of Privacy and Property Rights to the Disposition of Frozen Preembroyos in Intrafamilial Disputes,* 24 U Tol L Rev 763, 767 [1993] [hereinafter Note, *Privacy and Property])*. It appears that of the four States with any relevant laws on the subject, Louisiana's statutory scheme is the most comprehensive as it provides that an in vitro fertilized ovum is a juridical person *(see,* Note, *Privacy and Property, ibid.;* La Rev Stat Annot, tit 9, § 123). New York is among the majority of States which have not legislated in the area *(but see,* Domestic Relations Law § 73).

Cryogenic preservation has caused controversy abroad as well. The Supreme Court of Israel initially rejected a divorced woman's decision to implant frozen pre-zygotes over the objections of her former husband *(see, Nachmani v Nachmani,* Mar. 30, 1995, C.A. 5587/93). However, upon further review and reconsideration by the entire court *(see,* Gordon, *Court Upholds Legitimacy of Second Hearings,* Jerusalem Post, Mar. 3, 1996,

at 12), a 7-to-4 majority awarded possession of the pre-zygotes to Mrs. Nachmani, finding that once fertilization had occurred through IVF, "the positive right" to be a parent overcame "the negative right not to be [one]" (Friedman, *A Victory for Life,* Westchester Jewish Week, Sept. 20, 1996, at 1, 39). Unfortunately attempts to obtain an English translation of the decision have been unsuccessful.

A significant case arose in Australia when the American "parents" of three frozen pre-zygotes perished in a plane crash without providing for the disposition of the pre-zygotes. A great debate raged and the Australian State of Victoria ordered a study by the Waller Committee to consider the " 'social, ethical and legal issues arising from in vitro fertilization' " (Comment, *Frozen Embryos: A Need for Thawing in the Legislative Process,* 47 SMU L Rev 131, 156 [1993] [hereinafter Comment, *Frozen Embryos]).* The Waller Committee recommended that IVF participants be required to execute written consent forms which, *inter alia,* provide for the disposition of the pre-zygotes *(see,* Comment, *Frozen Embryos, id.,* at 156-157). The Victoria Parliament passed the Infertility Medical Procedures Act in 1988 to govern such future controversies *(see,* Comment, *Frozen Embryos, ibid).* Simultaneous therewith, the Warnock Committee released its report to the British government, setting forth 63 separate recommendations governing IVF procedures and facilities *(see,* Comment, *Frozen Embryos, id.,* at 157-158). Resulting legislation in Great Britain once again caused controversy and a debate raged over the fate of unclaimed frozen pre-zygotes due to be discarded as of August 1, 1996 *(see,* Ibrahim, *Ethical Furor Erupts in Britain: Should Unclaimed Embryos Die?,* NY Times, Aug. 1, 1996, at A1, col 1). Some other nations have adopted varying approaches to cope with the difficult issues posed by such cutting-edge reproductive technology *(see,* Lemonick, *Sorry, Your Time Is Up,* Time, Aug. 12, 1996, at 41).

## IV

Because the plurality concludes that the parties' contract with the Mather Hospital governs the resolution of this case, it does not discuss the facts of *Davis v Davis* (842 SW2d 588, *supra)* in sufficient detail. The concurrence, which essentially rejects a balancing of interests analysis as adopted by the *Davis* court, likewise does not adequately explore the similarities between *Davis* and the instant matter. Accordingly, I believe the following discussion is warranted.

*Davis* presented an analogous fact pattern. A husband and wife who could not produce a family through coitus turned to IVF. Their relationship subsequently soured and when they separated, seven pre-zygotes remained in cryogenic storage. Initially, Mrs. Davis desired implantation to achieve pregnancy. By the time the appeal was decided by the Tennessee Supreme Court, she sought to donate the pre-zygotes to a childless couple. At all pertinent times Mr. Davis opposed any disposition of the pre-zygotes that would result in involuntary fatherhood.

Among the many issues discussed by the court in *Davis,* it was significant that the Davises were permitted to participate in an IVF program without being required to execute an agreement providing for the disposition of the pre-zygotes in the event of death or divorce or other contingencies *(see,* Robertson, *Prior Agreements,* 51 Ohio St L J 407, *op. cit.).* Reportedly, the clinic was in the process of moving its location and the appropriate forms could not be found *(see,* Note, *Future Disputes,* 26 Conn L Rev, *op. cit.,* at 327). Accordingly, the court could not ascertain the parties' intentions by reference to an express contract.

The *Davis* court also considered the status of the pre-zygotes. After discussing, *inter alia,* the leading decisions of the United States Supreme Court on abortion, birth control, and the right to privacy and reproductive autonomy, the *Davis* court concluded that the pre-zygotes were not persons, nor were they property. Rather, in accordance with the guidelines of the Ethics Committee of the American Fertility Society, the *Davis* court recognized that the pre-zygotes transcended any person/property dichotomy. The court stated that pre-zygotes: " 'deserve[ ] respect greater than that accorded to human tissue but not the respect accorded to actual persons. The preembryo is due greater respect than other human tissue because of its potential to become a person and because of its symbolic meaning for many people. Yet, it should not be treated as a person, because it has not yet developed the features of personhood, is not yet established as developmentally individual, and may never realize its biologic potential' ". *(Davis v Davis,* 842 SW2d 588, 596, *supra,* quoting Report of Ethics Comm of American Fertility Socy published in 53 J Am Fertility Socy [No. 6], at 34S-35S [June 1990] [hereinafter Ethics Comm Report]). The court initially determined that had there been a valid contract between the Davises regarding the disposition of any unused pre-zygotes, that contract would have been enforceable *(see, Davis v Davis, supra,* at 597).

The *Davis* court rejected the contention that by virtue of their mutual participation in an IVF program the parties were bound by the terms of an implied contract *(see, Davis v Davis, supra,* at 598). The court held that the parties had not agreed upon any contingencies for reproduction outside of a marital context *(see, Davis v Davis, supra,* at 598).

The *Davis* court thus decided the controversy over the pre-zygotes by balancing the parties' respective rights to procreational autonomy. Recognizing that the right to privacy includes the right to be left alone, the court concluded that just as Mrs. Davis enjoyed a fundamental right to procreate, Mr. Davis had an equally fundamental right to avoid procreation. The *Davis* court further noted that in the context of in vitro fertilization where the pre-zygotes are not situated within the woman's body, respecting a man's objections did not violate the rule of cases such as *Planned Parenthood v Danforth* (428 US 52), i.e., the man was not compelling a woman to undergo an abortion in violation of her right to bodily integrity. Rather, balancing the parties' respective interests, the court concluded that Mr. Davis' right to avoid unwanted fatherhood was more compelling than was Mrs. Davis' right to donate the pre-zygotes to an infertile couple. The court noted that had Mrs. Davis still wanted the pre-zygotes to achieve motherhood herself against Mr. Davis' wishes, the case would have been "closer" *(Davis v Davis, supra,* at 604). The instant appeal presents such a "closer" case.

## V

The Supreme Court, Nassau County, correctly commenced its analysis with consideration of the issue whether the pre-zygotes were property or "persons". As the court further correctly concluded, the pre-zygotes are not "persons" entitled to constitutional protection. The United States Supreme Court expressly declined to confer person status upon the unborn in *Roe v Wade* (410 US 113, 162; *cf., Webster v Reproductive Health Servs.,* 492 US 490). Rather, as recognized by the court in *Davis v Davis,* the prevailing view is that cryogenically frozen pre-zygotes are entitled to " 'special respect * * * to protect the welfare of potential offspring' " *(Davis v Davis, supra,* at 596, quoting Ethics Comm Report, *op. cit.,* at 35S), and that decision-making authority with respect to the pre-zygotes rests primarily with the gamete providers *(see, Davis v Davis, supra,* at 597; *see also,* Note, *Future Disputes,* 26 Conn L Rev, *op. cit.,* at 309-310; Note, *Davis Dilemma,* 41 Case W Res

L Rev 543, *op. cit.;* Note, *Privacy and Property,* 24 U Tol L Rev 763, *op. cit.).* The parties to the instant appeal both essentially adopt this conclusion.

The Supreme Court also concluded that the informed consent document signed by the parties did not demonstrate their agreement to donate their pre-zygotes to scientific research in the event of their divorce, contrary to the ex-husband's contentions and the conclusion of the plurality. Indeed, the agreement expressly provides that "[i]n the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction". The addendum which provided for the donation of the pre-zygotes to scientific research is a contingency provision triggered only by "our *death* or any other *unforeseen* circumstances that may result in *neither* of us being able to determine the disposition of [our] pre-zygotes" (emphasis supplied). Obviously, divorce is not one of the enumerated contingencies triggering the operation of the dispositional addendum. Whether as a result of poor draftsmanship or design, the informed consent agreement simply does not compel any disposition as a result of divorce. Accordingly, this appeal may not be decided along a contractual analysis *(cf., McDonald v McDonald,* 196 AD2d 7).

## VI

As all members of this panel agree, the Supreme Court's conclusion that the ex-wife was solely responsible for determining the fate of the pre-zygotes is logically unsupportable. The lynchpin of the court's reasoning rested upon its intuitive determination that a woman's right to refuse to undergo an abortion and to carry a child to term equally applied to empower her with the exclusive right to decide to implant the pre-zygotes and give birth. The two situations are not analogous.

*Roe v Wade* (410 US 113, *supra)* and *Planned Parenthood v Danforth* (428 US 52, *supra)* teach us that a woman alone controls her bodily integrity; her choice dictates the fate of a nonviable fetus *(see,* Meeker, *Issues of Property, Ethics and Consent in the Transplantation of Fetal Reproductive Tissue,* 9 High Tech L J 185, 202 [1994]). As one commentator observed, "[a] woman's right to bodily integrity, as established in *Roe* and Danforth, simply is not implicated prior to implantation" (Note, *To Have or Not To Have: Whose Procreative Rights Prevail in Disputes Over Dispositions of Frozen Embryos?,* 27 Conn L Rev 1377, 1401 [1995] [hereinafter Note, *Procreative*

*Rights]).* In a morally analogous context the Court of Appeals of New York observed that a man "has a constitutionally protected right to decide for himself whether to father a child" *(Matter of L. Pamela P. v Frank S.,* 59 NY2d 1, 6). As the *Davis* court aptly concluded, procreational autonomy is a right enjoyed by both females and males and includes the right to decide to procreate or not procreate *(see, Davis v Davis, supra,* at 598-601).

Nor was the Supreme Court correct in concluding that the ex-husband's participation in the IVF program constituted a waiver of his right to avoid procreation. By participating in the program, the ex-husband indicated his desire to father a child with his then-wife, and absent evidence to the contrary, he did not waive for all eternity any objections to his ex-wife bearing his child long after the termination of their union. A waiver is an intentional and voluntary relinquishment of a known right *(see,* 57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 74). It is naive to cavalierly conclude that a marital attempt to conceive constitutes a waiver of the right to avoid procreation in a nonmarital context. Clearly, when two people pursue the extraordinary steps of in vitro fertilization to conceive a child in the context of their marriage, the termination of that union is an intervening event which may provide the parties with an opportunity to reconsider their decision *(see,* Note, *Procreative Rights,* 27 Conn L Rev, *op. cit.,* at 1400). Participation in an IVF program during a marriage cannot a fortiori be held to demonstrate, as a matter of law, a waiver of the right of former spouses to avoid procreation at a subsequent time.

### VII

While the concurrence and I agree with the Supreme Court's conclusion that the parties' contract is not dispositive of this controversy, we part company over the issue of whether the *Davis* balancing-of-interests approach should be adopted herein. While I recognize the concurrence's concerns that the constitutionally recognized right to avoid procreation can be irrevocably lost by unwanted implantation, it is equally important to recognize the procreational rights of a woman desiring implantation. These rights are just as fundamental, and, depending upon the circumstances of a given case, the right to procreate may be just as irrevocably lost as a result of the other party's veto. Simply stated, the competing fundamental, personal rights of both parties must be taken into consideration and balanced utilizing a fact-sensitive analysis.

I believe that just such an appropriate analysis to decide this controversy is that provided by the *Davis* court; "to consider the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions" *(Davis v Davis, supra,* at 603).

In approaching such a controversy between irreconcilably opposed fundamental rights to beget or not beget a child, we must consider "the burdens imposed on the parties by solutions that would have the effect of disallowing the exercise of individual procreational autonomy with respect to these particular preembryos" *(Davis v Davis, supra,* at 603). The issues to be decided herein cannot be oversimplified by deciding whether, in general, unwanted parenthood is a heavier burden than the denial of an opportunity for parenthood. Rather, the immediate question before us is whether the burdens of unwanted paternity to the "would-not-be father" exceed the deprivation of a possibly last opportunity for maternity to the "would-be-mother" in this case. That balancing test will require the consideration of many diverse factors.

Of critical importance, before a court decides that the ex-husband's objections should be respected, it must carefully consider whether the ex-wife possesses reasonable opportunities to achieve motherhood by other alternatives. For example, are there additional unfertilized eggs that have already been retrieved which might be fertilized by sperm donated by some male other than the ex-husband? How do the ex-wife's age, physical, emotional, and financial condition affect the possibility of any future attempt at IVF? Does she have the financial resources to effectively relieve the ex-husband of future child support obligations in accordance with her expressed intentions by, for example, establishing an irrevocable trust or by purchasing an annuity to assure his indemnification of such obligations? Is adoption a reasonable possibility? How sincere and deeply rooted is her emotional investment in this reproductive opportunity?

To be weighed against the foregoing factors, and any others a trial court might deem relevant, are the burdens attendant upon a man's unwanted fatherhood. Obviously, as a biological father, there will be a duty to support the child to age 21 *(see,* Family Ct Act § 413 [1]). At present it does not appear that a means exists to permanently and completely absolve a father of his support obligations even if, as the ex-wife herein suggests, she would be willing to bear them alone *(see, Matter of Thomas S. v Robin Y.,* 209 AD2d 298; *Matter of Harvey-Cook v*

*Neill,* 118 AD2d 109) (unless the ex-wife possesses extraordinary wealth and indemnifies the ex-husband as noted above). Moreover, there does not appear to be any enforceable means of waiving support obligations, even with the consent of the other parent *(see, Matter of L. Pamela P. v Frank S.,* 59 NY2d 1, *supra; Matter of Karen Beth B. v Douglas G.,* 216 AD2d 12). Ultimately, any child is entitled to be supported by his or her parents in accordance with the child's needs and the parents' means *(Matter of Boden v Boden,* 42 NY2d 210) although the ex-wife could theoretically agree to bear all or part of its support obligation which would, in effect, indemnify the ex-husband for his responsibilities so long as the child's needs are being met *(see, Matter of Brescia v Fitts,* 56 NY2d 132). While commentators may debate the advisability of permitting the abrogation of customary support obligations in nontraditional family settings *(see,* Bernstein, *This Child Does Have Two Mothers * * * and a Sperm Donor with Visitation,* 22 NYU Rev L & Soc Change 1, 25 [1996]; Schiff, *Solomonic Decisions in Egg Donation: Unscrambling the Conundrum of Legal Maternity,* 80 Iowa L Rev 265 [1995]; Schiff, *Frustrated Intentions and Binding Biology: Seeking Aid in the Law,* 44 Duke L J 524 [1994]), ultimately it is for the Legislature to enact such progressive laws. A strong case can be made for legislation relieving the objectant of unwanted parenthood by treating him as a sperm donor in cases such as this.

Clearly an ex-husband's 21-year-long potential child support liability may be an overwhelming consideration in many cases. However, it is not necessarily dispositive in all. Indeed, it may be of little or no importance where, for example, either party possesses extraordinary means to provide for the reasonable support needs of a child born through IVF. Similarly, support considerations may not be germane where an ex-husband has no income-producing capacity due to disability or incarceration. Consider, for example, the hypothetical case of a potential father who has been incarcerated for life but objects to the mother's wishes to procreate purely out of malice. Moreover, other equitable considerations may counterbalance an ex-husband's support objections; for example the ex-wife may have committed all of her financial resources to achieve in vitro fertilization with the understanding that it would proceed even in the event of divorce or separation.

There may well also be moral and psychological impacts upon a man who, against his will, is compelled to procreate with an ex-wife. If indeed the evidence establishes the ex-

husband's genuine psychological objections to be committed to a child genetically his, albeit whose birth was unwanted, he theoretically could be placed in the unenviable situation of having to deal with acrimonious visitation and/or custody disputes. A childless, divorced couple could be provided with new and lasting ammunition for their hostilities. At a minimum, the ex-husband might be forced to accept the fact that his genetic offspring walks the earth without his love and guidance. The *Davis* court paid special heed to Mr. Davis' tragic "boyhood experiences" in deferring to his objections to unwanted fatherhood *(Davis v Davis,* 842 SW2d 588, 603-604, *supra).* Clearly, objections to involuntary procreation should not be lightly cast aside.

On the other hand, there are undeniably numerous men who callously and thoughtlessly father children without any concern for their offspring. For such a man the psychological and emotional impacts of unwanted fatherhood would be less severe or even nonexistent. The motivation behind the objections should therefore be carefully scrutinized.

The instant record is insufficient to permit a fair balancing of the salient considerations. We have only minimal information regarding the parties' backgrounds, psychological make-ups, financial, and physical circumstances. Both parties have essentially taken the position that they should prevail as a matter of law without a factual inquiry. Therefore, further proceedings are necessary to flesh out the record so that the parties' respective interests and burdens may be evaluated and a factual determination may be rendered.

While the parties may have charted their procedural course by agreeing that this matter be determined upon the papers submitted to the Supreme Court, we are not bound by that agreement if it violates public policy *(see, Mitchell v New York Hosp.,* 61 NY2d 208, 214). In a matter as significant as this, one of first impression, this Court is not constrained to render a decision upon an insufficient record which does not allow for a fair and reasoned determination. Such a limited review would indeed violate public policy.

## VIII

The points raised by the concurrence warrant special attention insofar as I agree with its conclusion that the parties did not reach any agreement governing the disposition of the pre-zygotes. The necessary analysis of this controversy requires a sensitive balancing of the respective rights of the two individu-

als whose gametes combined to form the pre-zygotes. While in a given case, the factors against implantation may well outweigh those which favor implantation, artificial presumptions and bright-line tests tend to work more mischief than they avoid (see, Matter of Tropea v Tropea, 87 NY2d 727). Each ·case must be decided upon its own special facts. Indeed, a proponent of implantation should not be required to demonstrate exhaustion of all procreational alternatives where, for example, her former mate's opposition is not based upon any legitimate objections to parenthood but upon a desire to harass. In such cases sound judicial discretion does not need to be shackled by threshold showings and presumptions which exalt form over substance and subjugate the rights of one of the two individuals who should be on equal footing before the court. Therefore, while I agree with the concurrence's avowed egalitarian assertions that a woman's procreative choices should not enjoy an advantage over those of her former partner, neither should they be at a disadvantage.

Finally, insofar as the concurrence would award judgment to the ex-husband in this case thereby precluding implantation, I can only observe that it would be manifestly unfair to adopt a new, prospective standard requiring this ex-wife to have met evidentiary thresholds, created after the fact, so as to deny her any opportunity to have met those very thresholds. Indeed, the concurrence opines that only following a prima facie showing that other means of achieving parenthood are unavailable should a court entertain a balancing-of-interests approach. However, such a conclusion deprives the plaintiff herein of any opportunity of making that very showing. Therefore, in any event, this case should be remitted for further proceedings.

## IX

The *Davis* court expressly eschewed a rule that would provide the party resisting implantation with a right of veto. "[P]rocreational autonomy is composed of two rights of equal significance—the right to procreate and the right to avoid procreation" (Davis v Davis, 842 SW2d 588, 601, supra). The court thus recognized the undesirability of what one commentator has called "The Double Consent Rule" (Note, Davis Dilemma, 41 Case W Res L Rev, op. cit., at 572). However, in a seemingly contradictory statement, the *Davis* court further held that "[o]rdinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than [the] use

of the preembryos in question" *(Davis v Davis, supra,* at 604). I would not vote to adopt any presumption in favor of either position, but rather I conclude that each case must be decided on its individual facts.

Despite the competing and diverse viewpoints surrounding the issues before us, certain uncontroverted truths clearly emerge. Parenthood and the deprivation of parenthood are unique and profound experiences that invariably impact deeply upon the lives of both the willing and unwilling potential parent. It is a particularly precious experience to individuals who are required to resort to the extraordinary procedures of IVF. To the party resisting implantation after a relationship has failed, the psychological and financial burdens of unwanted parenthood will be a bitter pill to swallow. For the party who has suffered physically and invested heavily, emotionally, and financially in a desperate attempt to achieve parenthood, deprivation of this possibly singular opportunity may be devastating.

Ideally, parenthood should be achieved after thoughtful deliberation and careful preparation. Where IVF is undertaken, the forethought and planning that must of necessity precede it should result in a written agreement providing, *inter alia,* for the parties' wishes regarding disposition of pre-zygotes in the event of their divorce, death, or incapacity. In this way, the ultimate disposition of the pre-zygotes will be made by those responsible for their creation, when as prospective hopeful parents they were of one mind, rather than by Judges, and the fate of that "special property" will be accorded the "special respect" it deserves. Absent such voluntary, intelligent, and informed agreement between the participants, the courts should be required to resolve these difficult issues on a case-by-case basis, since the equities of each case are sui generis. Insofar as a majority of this Court finds that the parties' agreement does not resolve the issues in controversy herein, I respectfully conclude that the instant matter should be remitted to the Supreme Court, Nassau County, for the requisite consideration of the unique facts essential to reaching such a resolution.

COPERTINO, J., concurs with SULLIVAN, J.; FRIEDMANN, J., concurs in a separate opinion; MILLER, J. P., and ALTMAN, J., dissent in a separate opinion by MILLER, J. P.

Ordered that the judgment is reversed, on the law, with costs, and the matter is remitted to the Supreme Court, Nassau County, for entry of a judgment directing that the disposition

of the five pre-zygotes shall be in accordance with paragraph 2 (b) of Addendum No. 2-1 of the parties' informed consent agreement.